**MAVROMATIS et al. v. UNITED GREEK SHIP OWNERS CORPORATION et al.**

No. 34.

District Court, D. Maine, S. D.

April 8, 1947.

Richard K. Gould, of Portland, Me., and Arkin, Lebovici & Kottler, of New York City (Herbert Lebovici, of New York City, of counsel), for libellants.

Nathan W. Thompson, of Portland, Me., for defendants.

PETERS, District Judge.

This is a libel by eight members of the crew of the steamship Niki, who were discharged by the captain and forcibly removed from the ship at Portland, Maine, on July 23, 1946, whereby they seek to recover for three days wages and other sums in the way of damages, bonuses etc. aggregating more than $120,000.

I find the following facts: The Niki was sailing under the flag of Greece with a captain and crew of Greek citizens, but she was owned by the United States which had chartered her on a bare boat basis to the Greek Government which had, in turn, chartered her, with a Greek crew, back to the American Government for the carrying of American cargoes; in which business she was engaged at the time in question. The respondent, United Greek Ship Owners Corporation, a Delaware corporation, was the agent in this country for the Greek Government. The libel has been dismissed as to the other respondent named.

The libellants' causes of action are based principally upon their alleged wrongful discharge from the ship. The respondent claims that the discharge was justified by the conduct of the libellants,—alleged to have been rebellious and insubordinate to the point of mutiny.

The ship, with a crew of 39, including the libellants and the Greek captain, had returned to New York from a trip to Yokohama and left New York for Bremen in April, 1946, reaching Portland from Bremen July 19, 1946. Supplies were being carried to the American armies abroad. At the beginning of these trips the eight Greek seamen who bring this libel organized themselves into a band which they called the "committee of the ship", practically taking charge of the vessel, refusing at times to obey orders of the Captain and giving their own orders to the mate. They put the rest of the crew in fear, preventing them from obeying orders. Meetings of the crew were called by this committee and bodily injury was threatened those who did not attend. One man who kept away was assaulted. The assailant, being sent for by the Captain for an investigation, sent word that he was "sleeping" and remained where he was. The next day the boatswain told the Captain that he was afraid to ask this man to come aft. When in port these men left the ship when they pleased, disregarding the orders of the Captain. They instructed the crew to bring their grievances to the committee instead of the Captain, ordered the mate out of the wheelhouse, instructed the firemen when to work so that extra pay for overtime could be obtained, and generally were recalcitrant to the extreme, as claimed by the respondent.

It seems that this crew was "appointed" (as the Captain put it) to the ship by the Greek consul in New York (describing himself as Director of the Mercantile Marine Department of the Greek Consulate), and on return from the trip to Japan the Captain had reported the conduct of the men in question to the consul with a view to discharging them, but the consul directed the Captain to keep them aboard 'till they could be taken to Greece where they could be properly dealt with. On arrival in Portland, however, he concluded he could not submit to insubordination any longer, and, having communicated with the consul and received his permission and direction to discharge the eight men in question, tendered them their wages and ordered them out of the ship. The men refused to leave, and, again, under the instructions of the Greek consul in New York, policemen were summoned and the eight men referred to were forcibly removed from the ship. Their wages to the time of discharge, which had been tendered them, were refused and subsequently turned over to the Greek consul for their benefit by the Captain. This libel followed.

It will be noted that the above findings follow rather closely the testimony of the Captain of the Niki, who testified in person. I have accepted his statement as true. His background as well as his personality was in his favor. He was a captain in the Greek Royal Navy, having graduated from their Naval Academy in 1915, with a diploma later from the War College, and had held important naval commands and executive positions. He was designated by the Greek Government to take command of

this ship. He was in a difficult position in a foreign country with a mutinous group in his crew, but he acted with commendable restraint.

■ It is my conclusion that the master of the ship, being responsible for the safety of the vessel and crew and acting as he did under authority and instructions of the Greek consul, Director of the Mercantile Marine Department of the Greek Consulate, was within his rights and fully justified in discharging the men in question and that they have no cause of complaint based on wrongful discharge.

■ It can hardly be questioned that under general and long established maritime law the master of a ship has the right to discharge a rebellious crew, nor has any provision of Greek law to the contrary been brought to my attention. The T. F. Oakes, C.C., 36 F. 442.

It remains to be considered whether the libellants have a cause of action for any claims set forth in the libel not affected by what I have found to be their wholly justifiable and legal discharge from the ship.

It may be, as claimed by the respondent, that the conduct of the libellants, necessitating their discharge, has the effect of forfeiting the wages they had earned up to the time of their discharge. The respondent so claims and has cited the opinion of Judge Story in The Mentor, 17 Fed. Cas. No. 9427, and Weisthoff et al. v. American Hawaiian S. S. Co., 2 Cir., 79 F.2d 124. But even if otherwise, I cannot find any ground for recovery.

■ Subtracting from the various causes of action set up in the libel those that are based on wrongful discharge and those clearly vitiated by a justifiable discharge, we have left only the following: (1) The claims for a few days wages up to the time the libellants were removed from the ship by the police. The evidence is clear that they were tendered such wages by the Captain but they refused to take them. The money involved was then deposited for the men with the Greek consul, in accordance with the Greek law, where it was later accepted by some of the men after they had again been offered it by the consul. The money, unless taken out by the men, is still available for them. There is no further liability to pay it on the part of the respondent.

■ (2) The claim for double pay from the time the men were removed from the ship, amounting at the date of the libel to some $8,000, is based on Section 596, Title 46 of the U.S.C.A., but that statute is not applicable. The penalty feature it carries which is relied upon is conditioned on refusal to pay wages due seamen. The only refusal here was that of the men to take their money. Trent v. Gulf Pacific Lines, D.C., 42 F.2d 903.

(3) In their fourth cause of action the libellants claim to recover the sums of money deducted at various times, previous to their discharge, from their wages and deposited to the credit of each individual in the Midland Bank of England. To the amount so deducted the libellants have applied the accelerative provision of Sections 596 and 597 of Title 46 above referred to,— which impose cumulative penalties for refusing and neglecting to pay wages in a certain manner without sufficient cause, and consider that, up to the time the claim was formulated, in November, 1946, there was due them under this cause of action something over $50,000. Such a claim is wholly without foundation. The deductions from wages which are referred to were made as claimed, but they were made as required under the so-called "Agreements signed in London September 2, 1943, and published by the Federated Greek Maritime Unions, New York Branch." This collective agreement under which these seamen claim to be operating expressly provides for certain deductions from the wages at the end of each voyage and their deposit for the benefit of the individual seamen in the Midland Bank to be withdrawn by the beneficiaries "after the signing of an armistice between Great Britain and Germany or the liberation of Greece." There is no question that the deposits were made as agreed and required. There is no question also that the men consented to the deductions and settled periodically with the ship operators, signing re-

ceipts accordingly. There is no reason why the ship owners should pay this money twice.

In my opinion the libellants have failed to produce proof of sufficient weight to support any alleged cause of action not affected by the rightful discharge from the ship, and judgment may be entered dismissing the libel, with costs.