**MAVROMATIS et al. v. UNITED GREEK SHIPOWNERS CORPORATION.**

No. 4426.

United States Court of Appeals
First Circuit.

Dec. 5, 1949.

As Modified on Denial of Rehearing
Jan. 11, 1950.

Herbert Lebovici, New York City (Berman, Berman & Wernick, Portland, Me., and Arkin, Lebovici & Kottler, New York City, on the brief), for appellants.

Richard S. Chapman, Portland, Me. (Nathan W. Thompson and Benjamin Thompson, Portland, Me., on the brief), for appellee.

Before MAGRUDER, Chief Judge, WOODBURY, Circuit Judge, and CLIFFORD, District Judge.

MAGRUDER, Chief Judge.

Eight Greek seamen, who served aboard the S.S. Niki, filed in the court below a libel in personam against United Greek Shipowners Corporation, a Delaware corporation, to recover: (1) three days' unpaid wages from July 20 to July 23, 1946, plus penalties as provided in 46 U.S.C.A. §§ 596, 597; (2) the amount of wages withheld as compulsory savings, plus penalties as provided in 46 U.S.C.A. §§ 596, 597 in case of illegal deductions made "without sufficient cause"; (3) the amount of advances illegally made prior to the time the seamen's wages had actually been earned and thereafter deducted from the final wage payments, 46 U.S.C.A. § 599; (4) a bonus provided by the contract of employment for each six months' period of continuous honorable service; (5) damages prescribed by the Greek Commercial Code in case of wrongful discharge; and (6) damages for alleged false arrest in Portland, Maine.

The Niki, a liberty ship owned by the United States, was chartered to the Greek Government during the recent war, apparently on a bare-boat basis. While flying the Greek flag and manned by a Greek

crew, the Niki carried cargoes for the United States Army. Three such voyages are now in question. The first, commencing July 3, 1945, was from Norfolk, Virginia, to Holland, and return to New York the following September. The second, commencing September 25, 1945, and terminating March 31, 1946, was from New York to Japan and return. The third, commencing April 1, 1946, was from New York to Bremen and return to the United States; and on this return voyage the present libelants were discharged at Portland, Maine, on July 23, 1946.

During these voyages the Niki was operated by respondent for the Greek Government. The terms of the agency agreement do not appear, but on this appeal respondent did not press any challenge to libelants' contention that respondent must be deemed to be the owner pro hac vice; so we are not now concerned with the general problem considered in Cosmopolitan Shipping Co. v. McAllister, 1949, 337 U.S. 783, 69 S.Ct. 1317, and Fink v. Shepard S.S. Co., 1949, 337 U.S. 810, 69 S.Ct. 1330.

The district court found against libelants on all the claims, and entered a final decree dismissing the libel.

We find no error in the action of the district court in so far as it rejected claims based upon the alleged wrongful discharge of libelants.

It is undisputed that libelants were working under a collective agreement executed in London on September 2, 1943, by the Greek Shipping Cooperation Committee, a body established in London representing the Shipping Offices entrusted with the management of requisitioned Greek merchant vessels, on the one part, and on the other part by representatives of the Federated Greek Maritime Unions. Article (C) (2) of the agreement contains the following:

"(2) In view of the impossibility of applying Article 361 of the Commercial Code it is agreed that:

"(a) If a seaman, before completing six months' service, wishes to continue his employment, the shipowner is not entitled to discharge him except upon payment of the bonus hereinafter provided and payable on completion of six months' service. Where, however, the arbitration committee dealing with the settlement of disputes (provided for at the end of this agreement), or where no such committee is functioning, the consular or port authorities, consider that the discharge is justifiable, the shipowner is not liable to pay any compensation on account of such discharge.

"(b) Those completing six months' continuous service on the ship shall be entitled to a long period service bonus, amounting to £20 for ordinary members of the crew and to £25 for officers. * * * "

Libelants contend that each of them was unjustifiably discharged prior to the expiration of a six months' period of continuous service, and hence that each of them was entitled to a bonus of £20 as provided in art. (C) (2) (a).

The master testified at some length as to his reasons for discharging the men. He stated that libelants had formed themselves into a "Committee of the Ship" and had practically undertaken to supplant the captain in the control of the vessel; that as such committee they were responsible for repeated acts of insubordination and breaches of discipline. The captain further testified that on returning from the trip to Japan he had sought authorization from the Greek consul to discharge the men in question but that the consul then directed him to keep them aboard till they could be taken to Greece where they could be properly dealt with. However, the situation got so bad that when the Niki arrived in Portland on July 19, 1946, the captain again communicated with the Greek consul and with respondent, and this time received a direction from the consul and from respondent to discharge the men. The captain's testimony in this respect was corroborated by the deposition of the consul. Judge Peters, who was in a better position to determine the credibility of the witnesses, accepted this testimony as true, and concluded that the captain "being responsible for the safety of the vessel and crew and acting as he did under authority and instructions of the Greek Consul, Di-

rector of the Mercantile Marine Department of the Greek consulate, was within his rights and fully justified in discharging the men in question and that they have no cause of complaint based on wrongful discharge."

■ On this record, we cannot overturn as clearly erroneous the findings of the district judge as to the justification for the discharges. We think that these findings are not impeached by the fact that the course of conduct of which the master complained was not limited to the voyage on which the Niki was engaged when it arrived in Portland, Maine, but extended back into the two earlier voyages.

The aforesaid findings preclude any claim by libelants for the £20 bonus under art. (C) (2) (a) of the collective agreement. There was no arbitration committee functioning in the port of Portland. The Greek consul considered that the discharge was justifiable. The agreement itself provides in that event that the shipowner is not liable to pay any bonus on account of such discharge.

Libelants' claim under art. 361 of the Greek Commercial Code also fails. Article 361 provides that a seaman "discharged without justifiable cause, is entitled to be paid his wages in full and besides his pay to be paid an indemnity" equal to four months' wages. However, as noted above, the first sentence of art. (C) (2) of the collective agreement reads: "In view of the impossibility of applying Article 361 of the Commercial Code it is agreed that", etc. This would seem to imply that the bonus provision of the collective agreement was intended to be in lieu of the indemnity provided in art. 361. Whether art. 361 was in effect at the time in question is not clear; but we shall assume that it was. Even so, it does not help libelants' case, for under art. 361 the indemnity is payable only if the seaman is discharged "without justifiable cause". In view of his findings of fact, the district judge concluded that the discharges were justified under the general maritime law, citing The T. F. Oakes, C.C.D.Or. 1888, 36 F. 442, and he observed that no provision of Greek law to the contrary had been brought to his attention.

■ We think also that the district court was warranted in rejecting the claim for false arrest. It is clear from the testimony that the men were notified of their discharge on July 23, 1946, and that they nevertheless refused to leave the ship. On July 25, on instructions from the Greek consul, the master called the local police on board, and after the men again refused to leave, the master asked the police to take the men off, which the police proceeded to do. Whether the men offered more than passive resistance does not clearly appear. The police put handcuffs on them, escorted them to the local jail, and made complaints against them for assault and battery. At the hearing on these complaints in the Portland Municipal Court the men pleaded nolo, were found guilty, and given suspended jail sentences. It is clear that the master did not do anything more than ask the police to remove the men from the ship; under the circumstances, this use of force was privileged.

There remains for consideration the various wage claims set forth in the libel.

■ First, as to the wages for the three-day period July 20 to July 23, 1946: It appears from the sheets entitled "Account of Wages", which were introduced as exhibits, that on July 20, 1946, at Portland, payments were made to the seamen for the period April 1 to July 20, 1946. Upon discharging libelants on July 23, the captain offered them their wages for the three additional days, but they refused to accept such payment, apparently on the ground, which we have held above to be erroneous, that they were entitled to an additional bonus of £20 under the collective agreement and to an indemnity of four months' wages under art. 361 of the Greek Commercial Code, on account of being discharged, as they claimed, without justifiable cause. Thereafter the captain turned over to the Greek consul for the account of libelants the amount of wages due for these three days. The district judge found that payment "was later accepted by some of the men after they had again been offered it

by the consul." [70 F.Supp. 1005, 1007.] In this the district judge was mistaken, for the consul unequivocally stated in his deposition that when libelants later came to see him he offered them their wages and their seamen's books; that some of them took their books, but they refused to take the money; and that the consul never saw them again. As the matter stands, the wages for the three-day period, though tendered, have never been paid and are still owing. Libelants were entitled to recover their wages for such three-day period. However, since the nonpayment was not due to refusal or neglect by the master or owner, but to libelants' rejection of the tender of payment, libelants are not entitled to recover any penalty therefor under 46 U.S.C.A. §§ 596, 597. See The Corapeak, 4 Cir., 1931, 46 F.2d 262; Trent v. Gulf Pacific Lines, D.C.S.D.Tex. 1930, 42 F.2d 903; Martinez v. Matson S.S. Co., 5 Cir., 1938, 97 F.2d 19.

Next, as to the claims based upon deductions from wages on account of compulsory savings: The account sheets in evidence, showing wage payments to libelants in U. S. ports at the termination of each of the three voyages in question, established that such deductions were made in each instance. The captain testified: "There is an agreement whereby we must deduct from the crew's wages a certain specified amount, regulated for each man on board the ship, which we deduct and which is held by the agents who in time deposit it." The reference was to art. (B) of the collective agreement which provided that the amount of compulsory savings, varying according to the rank and grade of the members of the crew, "is deposited at the end of each voyage under the care and responsibility of the shipowners or the masters with the Midland Bank or with any other of the big five English banks. The amount of compulsory savings, the deposit of which will continue for the duration, should be placed in a separate account for each seaman with the Bank." The article further provided that the amounts so deposited could not be paid out to any person other than the seaman or his legal heirs and that such withdrawal could not take place until "after

the signing of an armistice between Great Britain and Germany or the liberation of Greece."

We think it clear that libelants were entitled to recover the amount of these deductions for compulsory savings. On this point it is hardly necessary to do more than to cite the well-considered decisions in Lakos v. Saliaris, 4 Cir., 1940, 116 F.2d 440; Glandzis v. Callinicos, 2 Cir., 1944, 140 F.2d 111; Venides v. United Greek Shipowners Corp., 2 Cir., 1948, 168 F.2d 681.

As stated in Shilman v. United States, 2 Cir., 1947, 164 F.2d 649, 650, certiorari denied 1948, 333 U.S. 837, 68 S.Ct. 608, 92 L.Ed. 1122, under the provisions of the Seamen's Act a seaman is entitled to payment, at the termination of his employment, "of all of his earned wages, without any deductions except those which are expressly authorized by statute." 46 U.S.C.A. § 596 provides that a seaman making foreign voyages is entitled to his wages within twenty-four hours after the cargo is discharged, or within four days after the seaman is discharged, whichever happens first. Every master or owner who refuses or neglects to make such payment "without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed", which sum shall be "recoverable as wages in any claim made before the court". Under § 597, a seaman is entitled to receive on demand one-half the balance of his wages earned and remaining unpaid, at every port where such vessel, after commencement of the voyage, shall load or deliver cargo before the voyage is ended; and "when the voyage is ended every such seaman shall be entitled to the remainder of the wages which shall be then due him, as provided in section 596". It is settled that these provisions apply to seamen on foreign vessels in ports of the United States. Strathearn S.S. Co., Ltd. v. Dillon, 1920, 252 U.S. 348, 40 S.Ct. 350, 64 L.Ed. 607; The Sonderborg, 4 Cir., 1931, 47 F.2d 723, certiorari denied sub nom. Akties, Dampskibsselskabet Donnenborg v. Mikkelsen, 1931, 284 U.S. 618, 52 S.Ct. 7, 76 L.Ed. 527;

Venides v. United Greek Shipowners Corp., supra.

The cognate § 599 provides in subsection (b) that it shall be lawful for any seaman to stipulate in his shipping agreement for an allotment of a portion of his wages to certain relatives, "or for deposits to be made in an account opened by him and maintained in his name either at a savings bank or a United States postal savings depository"; such allotment to be valid, however, only when made under the carefully defined procedure set forth in subsection (c)—which admittedly was not complied with here. Subsection (d) provides that no allotment shall be legal except as provided in this section. The provisions of § 599 are applicable, as stated in subsection (e), "as well to foreign vessels while in waters of the United States, as to vessels of the United States".

It comes to this: Congress has prescribed, in case of seamen on foreign vessels whose employment terminates in a United States port, that they shall be paid, cash in hand, their full wages earned during their employment minus only the deductions authorized by the provisions of the Seamen's Act. These paternalistic provisions in favor of seamen, as "the wards of the admiralty", were designed to protect from overreaching a generally impecunious and improvident class of persons, and to insure that seamen will not be turned ashore with little or nothing in their pockets. See Shilman v. United States, 2 Cir., 1947, 164 F.2d 649, certiorari denied 1948, 333 U.S. 837, 68 S.Ct. 608, 92 L.Ed. 1122.

Venides v. United Greek Shipowners Corp., supra, held, in another case against the same respondent now before us, and in respect of the compulsory savings provision of the same collective agreement here involved, that deductions on account of such compulsory savings, in final payment of the seamen in a port of the United States at the termination of his employment, were unlawful under the Seamen's Act. The holding in the Venides case was on the authority of Lakos v. Saliaris, supra, and Glandzis v. Callinicos, supra, cases also involving Greek seamen working under similar agreements providing for compulsory savings.

It is our opinion also that libelants were entitled to recover the penalty prescribed in 46 U.S.C.A. § 596, on account of these unlawful deductions for compulsory savings. As stated above, § 596 provides that "Every master or owner who refuses or neglects to make payment in the manner hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed". In Collie v. Fergusson, 1930, 281 U.S. 52, 55, 56, 50 S.Ct. 189, 191, 74 L.Ed. 696, the Court pointed out that the phrase "without sufficient cause" must be taken to embrace something more than valid defenses to the claim for wages; otherwise, it would have added nothing to the statute; and that the penalty "is not incurred where the refusal to pay is in some reasonable degree morally justified". To similar effect is the statement of the Court in McCrea v. United States, 1935, 294 U.S. 23, 30, 55 S.Ct. 291, 294, 79 L.Ed. 735: "The statute thus confers no right to recover double wages where the delay in payment of wages due was not in some sense arbitrary, willful, or unreasonable." In the present case the captain, prior to discharging libelants, consulted both United Greek Shipowners Corporation and the Greek consul, and informed them of the difficulties he was having with the seamen. Both respondent and the consul instructed the captain to discharge these men. But respondent did not at that time instruct the captain, in making final payment of wages, to observe the provisions of the Seamen's Act which prohibited the deductions on account of compulsory savings. There is a stipulation in the record that the officers of respondent corporation, as of September 1, 1945, admit that they have notice of the decision in Glandzis v. Callinicos, 2 Cir., 1944, 140 F.2d 111, and that as laymen they had notice of its purport; in the stipulation it was further recited that respondent's officers "admit that they had notice of Title 46 U.S.C.A. Sections 596, 597 and 599, and as laymen of the purport of the same." Notwithstanding these admissions, respond-

ent offered no excuse for its failure to comply with the requirements of the Seamen's Act, not even suggesting that, despite the adverse ruling in Glandzis v. Callinicos, it continued to believe, under advice of counsel, that it had the lawful right to make the deductions on account of compulsory savings. Under these circumstances Venides v. United Greek Shipowners Corp., supra, is square authority for the proposition that respondent has failed to show "sufficient cause" for its neglect to make payments of wages to libelants in full in accordance with the requirements of the Seamen's Act. For other cases in which the penalty was enforced, see The Lake Gaither, 4 Cir., 1930, 40 F.2d 31; The City of Montgomery, D.C.S.D.N.Y. 1913, 210 F. 673; The Sonderborg, 4 Cir., 1931, 47 F.2d 723, 727 et seq., certiorari denied sub nom. Akties, Dampskibsselskabet Donnenborg v. Mikkelsen, 1931, 284 U.S. 618, 52 S.Ct. 7, 76 L.Ed. 527; Swanson v. Torry, 4 Cir., 1928, 25 F.2d 835.

The penalty provided by § 596 is therefore applicable, but we do not think the penalty should run beyond the date of the district court's decree of January 21, 1949, dismissing the libel in the case at bar. The language of § 596 has been given a somewhat free reading so as to accord to the courts a considerable margin of discretion in adjusting the duration of the penalty to the equities of the particular case. Pacific Mail S.S. Co. v. Schmidt, 1916, 241 U.S. 245, 36 S.Ct. 581, 60 L.Ed. 982; Mystic S.S. Co. v. Stromland, 4 Cir., 1927, 20 F.2d 342. After the district court had determined that the deduction on account of compulsory savings was lawful, it can hardly be said that the neglect of respondent thereafter to make the payments was "arbitrary, willful, or unreasonable" or not "in some reasonable degree morally justified," even though, on this appeal, it is eventually determined that the district court was in error.

Finally, in respect to the claim for recovery of wages previously advanced, we think the district court was in error in dismissing the libel.

46 U.S.C.A. § 599(a) provides under criminal penalties that it shall be "unlawful in any case to pay any seaman wages in advance of the time when he has actually earned the same"; that payment of such advance wages "whether made within or without the United States * * * shall in no case except as herein provided absolve the vessel or the master or the owner thereof from the full payment of wages after the same shall have been actually earned, and shall be no defense to a libel suit or action for the recovery of such wages." Under the foregoing, it is not enough to show that payments had been made on wage account in the course of the voyage, but the seaman must further show that a payment of wages had been made "in advance of the time when he has actually earned the same". Section 599(e) provides that the section as a whole "shall apply as well to foreign vessels while in waters of the United States, as to vessels of the United States". It is settled that § 599(a) applies to foreign vessels to the extent only that such prohibited advances were made in ports of the United States. Sandberg v. McDonald, 1918, 248 U.S. 185, 39 S.Ct. 84, 63 L.Ed. 200; Jackson v. S.S. Archimedes, 1928, 275 U.S. 463, 48 S.Ct. 164, 72 L.Ed. 374.

The district court made no findings with reference to the amount of such illegal advances, nor did its opinion give any clue as to the reason for rejecting the claims of the libel in this respect. The pay sheets all show deductions for "advances" or cash payments theretofore made. In some instances they indicate that the advances were made in this country. They do not in all cases indicate that payments which were deducted from the final settlements had been made in advance of the time when the seaman had actually earned the same. However, there was testimony by one of the libelants, and by the master, tending to show that advances were usually made when the seaman joined the crew, which in the case of all the libelants but one occurred in a port of the United States; and in these instances, obviously, the advances must have been made before the wages were earned. At one point, when counsel for libelants was questioning the captain as to the extent to which these advances were

on account of wages not yet earned, the line of inquiry was ended by the remark of the district court that the pay sheets would speak for themselves.

■ On remand, the district court will have to determine the exact amounts which the various libelants are entitled to recover on account of deductions for illegal advances. Recovery cannot be limited, as respondent contends, to the amount of the prohibited advances made on the final voyage, but includes also advances made during the two previous voyages. Korthinos v. The Niarchos, 4 Cir., 1949, 175 F.2d 730, 733. Perhaps the exact amounts to be recovered may be supplied by stipulation; if not, it may be necessary to open up the case for further evidence. Libelants have made no claim for the penalty prescribed in 46 U.S.C.A. § 596, as applied to the prohibited deductions on account of advances; so the matter of the penalty need not be considered in this connection.

■ Respondent urges that whatever liabilities it might otherwise have incurred, the seamen are bound by the language of release contained on the account sheets which they signed. Above the line of signature appears the following printed form: "The above account of earnings and of deductions is correct. Received in full settlement of all earnings and claims the sum of * * *." For several reasons, such alleged release is not binding on the seamen. There has been no compliance with the procedural requirements of 46 U.S.C.A. § 644 for releases in the settlement of wage claims; even if there had been, such releases could be set aside by the court under § 597 for "good cause shown", and as stated in Korthinos v. The Niarchos, supra, 175 F.2d at page 733, "good cause" for setting aside the releases "is that the settlement does not include the full amount due after the advances forbidden by statute are eliminated." Furthermore, and quite apart from these specific provisions of law, the alleged releases would be inoperative for failure of respondent to maintain the burden of establishing that the purported effect of the documents as releases was fully comprehended by the seamen and that there had been a full disclosure to the seamen of the legal rights they were giving up in exchange for the settlement offer. See Bay State Dredging & Contracting Co. v. Porter, 1 Cir., 1946, 153 F.2d 827, 833.

The decree of the District Court dismissing the libel is vacated and the case is remanded to the District Court for further proceedings not inconsistent with this opinion. Appellants recover costs in this court.

### On Petition for Rehearing.

■ In a petition for rehearing, United Greek Shipowners Corporation asserts that libelants were not entitled to the penalty prescribed in 46 U.S.C.A. § 596 on account of the unlawful deductions for compulsory savings, because libelants made no demand for payment of the amount of these deductions prior to the filing of the libel. It may be that the seamen made no such demand at the time of their discharge because they were unaware of their statutory rights under the law of the United States. But this is immaterial. Section 596 imposes no requirement of a demand; rather, it imposes the duty on the master or owner to pay the seamen what the law requires. The penalty applies not only when the master or owner "refuses", but also when he "neglects to make payment in the manner hereinbefore mentioned without sufficient cause". In this connection, the language of § 596 is to be contrasted with the provision of § 597 which entitles a seaman to receive "on demand" one-half part of the balance of his wages earned and remaining unpaid, at every intermediate port where the vessel, after the voyage has been commenced, shall load or discharge cargo before the voyage is ended.

With reference to the penalty, we said in our original opinion: "The penalty provided by § 596 is therefore applicable, but we do not think the penalty should run beyond the date of the district court's decree of January 21, 1949, dismissing the libel in the case at bar. The language of § 596 has been given a somewhat free reading so as to accord to the courts a considerable margin of discretion in adjusting the duration of the penalty to the equities of the particular case. Pacific Mail S. S. Co. v. Schmidt,

1916, 241 U.S. 245, 36 S.Ct. 581, 60 L.Ed. 982; Mystic S. S. Co. v. Stromland, 4 Cir., 1927, 20 F.2d 342. After the district court had determined that the deduction on account of compulsory savings was lawful, it can hardly be said that the neglect of respondent thereafter to make the payments was 'arbitrary, willful, or unreasonable' or not 'in some reasonable degree morally justified,' even though, on this appeal, it is eventually determined that the district court was in error."

It is pointed out in the petition for rehearing that the opinion of the district court, reciting the facts and concluding that the libel should be dismissed, was filed April 8, 1947, but that the final decree, from which the present appeal was taken, was not entered until January 22, 1949. Though the record so indicates, our attention was not directed to this spread in dates, and it escaped our notice upon our prior study of the case. From the petition for rehearing and the memorandum in opposition thereto, it appears that the final decree would have been entered promptly after the filing of the opinion, but for efforts of libelants to obtain from the district judge more formal and elaborate findings of fact and conclusions of law. The moves to this end by counsel for libelants, and the details of the various negotiations between counsel after the opinion was filed, need not be recited or commented upon, except for the statement of our conclusion that the delay in the entry of the final decree does not seem to have been chargeable to any fault on the part of counsel for the shipowner.

█ The statutory penalty, under the circumstances of this case, is obviously a harsh one, though demanded by the terms of the law. As we stated in our original opinion, after the district court "had determined that the deduction on account of compulsory savings was lawful", it could hardly be said that the neglect of the shipowner thereafter to make the payments was "arbitrary, willful, or unreasonable" or not "in some reasonable degree morally justified". The district court announced its determination to this effect when it filed its opinion on April 8, 1947. The logic of our reasoning dictates that the penalty should

not run beyond the date of that determination, namely, April 8, 1947; and we would have so stated in our earlier opinion had we realized that the final decree was not entered until many months after the opinion had been filed.

From the petition for rehearing and the memorandum in opposition thereto, we gather that our original opinion was not sufficiently explicit in indicating the beginning date of the running of the penalty. 46 U.S.C.A. § 597 provides that "when the voyage is ended every such seaman shall be entitled to the remainder of the wages which shall be then due him, as provided in [section 596]". Section 596 provides, in case of vessels making foreign voyages, that the master or owner shall pay to every seaman his wages "within twenty-four hours after the cargo has been discharged, or within four days after the seaman has been discharged, whichever first happens". The application of these sections is clear enough when the seaman is engaged for a single described voyage and the agreement terminates at the end of that voyage. But such was not the situation here. In retrospect, it appears that the Niki made three distinct voyages while the libelants, or most of them, were members of the crew. When the libelants went before the Greek consul at the office of the Greek Mercantile Marine and were there registered as members of the crew, they were not signed on for any specific voyage; indeed, the Niki was at that time, in respect of voyages, under orders of the United States War Department, and future voyages could not be known until indicated by such authority. The seamen were taken on for periods of indefinite duration, and remained as members of the crew for successive voyages, without any formal renewal of their engagement from voyage to voyage. Apparently, the seamen were entitled to obtain their discharge at the end of any round voyage, provided they so informed the master before the ship's arrival at their port of discharge. In the present case, however, the continuous employment of libelants under a single agreement did not terminate until they were discharged at Portland during the third voyage.

Under the circumstances of this case, it is not clear to us that libelants at the end of each of the first two voyages were entitled by law to full payment of their wages then earned and unpaid, respectively, without any deduction for compulsory savings. Their continuous employment was not terminated at the end of either of the first two voyages. They were not then turned ashore with little or nothing in their pockets, but remained as members of the crew. Since their engagement did not terminate at the end of either the first or the second voyage, it may be that their only statutory right at the end of each of those voyages was to receive "on demand" one-half part of the balance of wages earned and remaining unpaid at those times, as provided in the first part of § 597. We have found no illumination in the authorities on this point, and we are not prepared to say just what were the statutory rights of these seamen at the end of the first two voyages. In view of the statutory ambiguity, the dearth of authority interpreting the applicable provisions, and our own unresolved doubt in the matter, it certainly cannot be said that the master or owner of the Niki was "arbitrary, willful, or unreasonable" in neglecting to pay the seamen, at the end of the first and second voyages, the full amount of the wages then due and unpaid, without deduction except as authorized by law. But it is clear that when their engagements were terminated by their discharge in Portland during the third voyage, they were then entitled to final payment of all their wages then due and unpaid without any deduction on account of compulsory savings which had been withheld from their pay at any time during the entire period of their service. We think that in the circumstances here presented the statutory penalty under § 596 began to run on July 28, 1946, which was the fifth day after libelants had been discharged at Portland; and, as already indicated, the penalty must continue to run up to and including April 8, 1947, but not beyond that date.

Except to the extent that our original opinion is modified by what we have said herein, the petition for rehearing is denied.