**Keith W. FORSTER, Plaintiff,**

v.

**ORO NAVIGATION COMPANY,
Defendant.**

United States District Court,
S. D. New York.

Aug. 27, 1954.

---

10.  Notes 3 and 4, supra.

Dunn & Zuckerman, by Morton Zuckerman, New York City, for plaintiff.

Kirlin, Campbell & Keating, New York City, by Joseph M. Cunningham and Joseph Hanley, New York City, for defendant.

BONDY, District Judge.

The claims of the plaintiff, an able-bodied seaman, arise out of the alleged wrongful discharge by the defendant, the owner and operator of the S. S. Eugenie, at Piraeus, Greece, and the neglect of her master to pay to the

plaintiff his earned wages at the time of his discharge.

The plaintiff signed articles on the Eugenie in San Francisco, October 31, 1950 for a foreign voyage, a month after the Eugenie departed from Baltimore on that voyage. About a month later plaintiff was elected by the ship's crew, union delegate, pursuant to an agreement between the defendant and the Seafarers International Union of North America, Atlantic and Gulf District (hereinafter referred to as S. I. U.) of which the plaintiff was a member. As such he presented to the master, Hans Mogensen, grievances of the crew as to food, draws, shore leave and sanitation.

The master had trouble with some of the crew during the voyage of the Eugenie from Baltimore to San Francisco before the plaintiff joined the Eugenie as well as during the remainder of the voyage from the West Coast of the United States to Greece.

On the arrival of the Eugenie at Piraeus, Greece, January 19, 1951, seamen Buckner, Turner, Hightower, Podgurski and the plaintiff complained to the American vice-consul at Athens about conditions on the ship. Upon inspection Vice-Consul Harry Lofton found some of the complaints justified and held a meeting aboard the ship at which the master, the plaintiff and some members of the crew, including Buckner, Turner, Hightower and Podgurski, were present. In a deposition taken before trial he stated that members of the crew were not cooperative nor respectful to the master, that plaintiff did not encourage other members of the crew to maintain order and that all persisted in shouting their demands at once.

On the night of the arrival of the Eugenie at Piraeus, while Mogensen was asleep in his cabin, Podgurski and Buckner, "crazy drunk", broke into his cabin. After pointing a gun which he took from under his pillow at them, Mogensen ran to call the police. On his way, waiving his gun at plaintiff, he ordered the plaintiff, who was on gang-way watch, to go up to his cabin and get the men away from his room, which plaintiff did. Eventually with the aid of the Greek harbor police Buckner, Turner, Hightower and Podgurski were taken off the ship and put in jail.

Next day, January 20, 1951, plaintiff and the four seamen, who had spent the night in jail, appeared before Captain Mogensen, Vice-Consul Lofton and a United States Coast Guard Lieutenant Commander. Plaintiff was told that his wages would be paid in full if he would sign off by mutual consent. Plaintiff refused to do so. About half an hour later plaintiff was recalled and was told that he could remain on the ship if he would repent, change his conduct and resign as ship's delegate. Plaintiff refused to do so, stating that he never did anything wrong and that he refused to resign as ship's delegate because that was up to the crew. A half hour later plaintiff was recalled again and told that he must either sign off by mutual consent or get nothing, and plaintiff again refused to do so. Although the master testified that plaintiff was always given the opportunity to sign his pay voucher and obtain his wages, Vice-Consul Lofton, corroborating the testimony of plaintiff, stated that "the master was willing to pay them off in the event that they would sign-off by mutual consent" (a practice which was discouraged by the Foreign Service Regulations of the State Department. FSR XVIII 4(i) July 9, 1946), that plaintiff refused to sign the articles, pay voucher or certificate of discharge, and also that plaintiff was offered his earned wages only "provided he signed-off properly".

The court accordingly finds that no part of the plaintiff's earned wages were tendered to him at the time of his discharge or within four days thereafter otherwise than on conditions.

The four seamen were discharged for misconduct January 20, 1951 and plaintiff next day was signed-off for misconduct. All five men were maintained by defendant in Greece and returned to New York City in the tourist class on

another ship. Upon reaching New York plaintiff went to the office of the defendant and demanded his wages. The defendant, having received a letter from Captain Mogensen suggesting that the wages of the five men who were discharged be withheld pending a determination of the extent of the damage to the ship as a result of the disturbance on the 19th of January, refused payment.

Thereafter plaintiff accompanied by a union delegate returned to the offices of the defendant and again demanded his wages and $50 were paid to him on account of his wages.

The defendant admits that the plaintiff at the time of his discharge was entitled to the wages earned by him amounting to $270.35.

As a first cause of action it is alleged in the complaint that the defendant failed to pay the plaintiff his earned wages at the time of his discharge "without sufficient cause".

R.S. § 4529 as amended, 30 Stat. 756, 38 Stat. 1164, 46 U.S.C.A. § 596, provides that the master or owner of any vessel making foreign voyages shall pay to every seaman a sum equal to one-third of his earned wages at time of his discharge and the balance thereof within four days thereafter and that any master, or owner who refuses or neglects to do so "without sufficient cause" shall pay to the seaman a sum equal to two days' pay for every day during which payment is delayed.

■ The refusal or neglect of the defendant to make such payment if without sufficient cause rendered the defendant liable irrespective of whether or not the discharge was proper and irrespective of what happened after the discharge.

■ A refusal to pay earned wages, that is "arbitrary, willful, or unreasonable", is a refusal without sufficient cause. McCrea v. United States, 294 U.S. 23, 30, 55 S.Ct. 291, 294, 79 L.Ed. 735. The liability is incurred unless the refusal to pay earned wages is in some reasonable degree morally justified. Collie v. Fergusson, 281 U.S. 52, 56, 50 S.Ct.

189, 74 L.Ed. 696. See also Mavromatis v. United Greek Shipowners Corporation, 1 Cir., 179 F.2d 310, 315, 316. In the opinion of the court there is not any evidence of any reason for refusing to pay unconditionally wages actually earned by the plaintiff.

■ The tender of wages to the plaintiff was not sufficient since it was made upon a condition other than the signing of a receipt for money received. See The Corapeak, 4 Cir., 46 F.2d 262; The Lake Gaither, 4 Cir., 40 F.2d 31, 34; Mandelin v. Kenneally, 4 Cir., 11 F.2d 344; Cf. The Fletero v. Arias, 4 Cir., 206 F.2d 267, certiorari denied 346 U.S. 897, 74 S.Ct. 220, 98 L.Ed. 398. "Only such deductions and set-offs for derelictions in the performance of his (the seaman's) duties shall be allowed against his wages as are recognized in the statutes." Isbrandtsen Co. v. Johnson, 343 U.S. 779, 787, 72 S.Ct. 1011, 1017, 96 L.Ed. 1294. See also Mavromatis v. United Greek Shipowners Corporation, supra; Shilman v. United States, 2 Cir., 164 F.2d 649, 650, certiorari denied 333 U.S. 837, 68 S.Ct. 608, 92 L.Ed. 1122, and there were not any such. There is not any evidence that plaintiff damaged the ship or any other property.

Moreover, the refusal by the defendant to pay the earned wages to the plaintiff was repeated in New York. Compare Villigas v. United States, D.C., 8 F.2d 300.

■ The number of days for which the defendant must pay double wages rests in the discretion of the court and depends upon the equities of the particular case. Mavromatis v. United Greek Shipowners Corporation, supra, 179 F.2d at page 316; Mystic S. S. Co. v. Stromland, 4 Cir., 20 F.2d 342, certiorari denied 276 U.S. 618, 48 S.Ct. 213, 72 L.Ed. 734; The Victoria, D.C., 76 F.Supp. 54, 56, 1948 A.M.C. 10, 12, 18, reversed on other grounds Usatorre v. The Victoria, 2 Cir., 172 F.2d 434; The Chester, D.C., 25 F.2d 908, 911.

Plaintiff began an action to recover his earned wages and double wage pen-

alty in the City Court of the City of New York May, 1951. The action was removed to this court June, 1951 and issue joined June 14, 1951. In January, 1952, an order was obtained on defendant's motion granting a preference for trial on April 21, 1952. However, the action was not brought to trial until almost two years after the preference was granted. Congress could not have intended that the penalty should be entirely dependent on the time of payment irrespective of the seaman's lack of diligence. See The Victoria, supra; The Chester, supra.

The court is of the opinion that the case could have been prepared and tried sooner if the parties had acted with proper diligence. The court believes that with due diligence a preference would have been obtained, Cf. The Victoria, supra, the deposition of the witness in service of the government and of the master could have been obtained and the action tried within ten months after the discharge and five and one-half months after issue, within which time the defendant could have made a tender in court, see The Fletero v. Arias, supra, 206 F.2d at page 274; Wieder v. Isbrandtsen Co., 2 Cir., 186 F.2d 496, 499, or earned wages given to the vice-consul. See Foreign Service Regulations, supra XVIII–5.

■ A tender that did not include a sum for penalty wages under R.S. § 4529 was not a sufficient tender. Gerber v. Spencer, 9 Cir., 278 F. 886.

■ Plaintiff's daily wage was 1/30 of his monthly wage of $248.41 or $8.28, See Gerber v. Spencer, supra, and plaintiff therefore is entitled to $16.56 for 300 days, amounting to $4,968.

■ The agreement between the S. I. U. and the Oro Navigation Company, made a part of the ship's articles, became a part of the contract between the plaintiff and defendant. See 4 Benedict on Admiralty 1953 Supp., section 626a.

■ For a second cause of action it is alleged that plaintiff is entitled to $10 a day for each day payment of overtime wages was delayed, as provided by the agreement between the defendant and S. I. U., Art. II, Sec. 31. This is an agreement fixing alleged damages in advance of a breach, entirely unrelated to any reasonably anticipated damage. It provides for a penalty and not the liquidation of damages and accordingly is unenforceable. See Restatement of Contracts 339; 3 Williston on Contracts, revised edition, Sec. 776; Cf. United States v. Le Roy Dyal Co., 2 Cir., 186 F.2d 460, 461, certiorari denied 341 U. S. 926, 71 S.Ct. 797, 95 L.Ed. 1357.

For a third cause of action it is alleged that plaintiff is entitled to the difference between the cost of second class transportation and the cost of his transportation as a tourist passenger to New York which it has been stipulated amounts to $135, and for a fourth cause of action, it is alleged that plaintiff is entitled to payment of the cost of transportation by rail from the port of New York to San Francisco, the place at which he signed the articles, which it has been stipulated amounts to $138.88. These are elements of damages due to defendant's breach of plaintiff's employment contract with the defendant. See Secs. 14 and 55 of the agreement between S. I. U. and the defendant.

For a fifth cause of action it is claimed that the defendant breached its contract with the plaintiff by reason of his wrongful discharge.

At the time when plaintiff was discharged a consular certificate of discharge was given to the master. In his deposition the vice-consul states that after observing plaintiff's conduct at the Consulate and at the meeting on board the Eugenie and after he made a "complete investigation of all the factors pertaining to the trouble on the vessel, he could come to no other conclusion than if he (plaintiff) remained upon the vessel without changing his conduct his presence could possibly endanger the lives of all persons thereon while on the high seas."

The plaintiff, however, testified that he had never disobeyed the master, that he had not been involved directly or indirectly in the disturbance aboard the Eugenie on the 19th or at any other time and that he never damaged anything aboard the ship. The official logbook does not reveal that plaintiff ever was "logged" for disobedience or for any other reason. Moreover, Captain Mogensen himself, on his examination before trial, testified that he could recall only one ocassion on which he had seen plaintiff act disrespectfully. Mogensen's chief complaint was that plaintiff as ship's delegate had not heeded his requests to restrain the crew and to maintain proper discipline. Mogensen also testified that he had never seen or heard plaintiff encourage other members of the crew to make trouble, to be disrespectful to, or to disobey the master or the other officers of the ship.

■ "Discharges at foreign ports are greatly disfavored in maritime law." 1 Norris, The Law of Seamen (1951) page 495. When "the discharge is predicated on a charge of misconduct on the part of the seaman, the consul should be satisfied that the misconduct is of a gross or serious nature since the admiralty courts do not sanction a discharge for trivial reasons." Norris, supra, at page 63; see Trent v. Gulf Pacific Lines, D.C., 42 F.2d 903, 904; Foreign Service Regulations supra XVIII-4, note 1(a).

■ The consular certificate is only prima facie evidence of the reason of the discharge and that the discharge was proper. The Golden Sun, D.C., 30 F. Supp. 354, 356; The W. F. Babcock, 85 F. 978, 982; The Sachem, D.C., 59 F. 790; 1 Norris, The Law of Seamen (1951) page 58. See Davidson v. U.S., 1925 A.M.C. 1210, 1211.

There was not any evidence before the consul or before the court that plaintiff ever was a party to any disturbance or did anything endangering the ship or crew.

It does not appear that the vice-consul inquired carefully into the facts. See Foreign Service Regulations, supra, XVIII-4. It appears that prior to plaintiff's discharge no officer or member of the crew of the Eugenie other than Captain Mogensen, who made the charge, had been questioned by him about plaintiff's participation in disturbances aboard the ship and it is apparent that Lofton relied on impressions made upon him by the plaintiff at the Consulate and at the meeting on the Eugenie, and statements the master may have made to him. The master himself testified only that he believed the plaintiff "incited the riot". There is not any satisfactory evidence of any disobedience by the plaintiff to sustain the discharge for misconduct.

The fact that plaintiff was told he could remain with the ship, if he would repent, obey the captain, and resign as delegate, and that he refused to do so, does not justify the inference that he would disobey or not be loyal to the master, especially in view of the fact that as the consul states, he refused to do so because he never did any wrong.

■ Accordingly the court finds that plaintiff has established that his discharge was wrongful. See Trent v. Gulf Pacific Line, supra; 1 Norris, The Law of Seamen (1951) section 461; Cf. The Donna Lane, D.C., 299 F. 977, 982.

■ Since the plaintiff was wrongfully discharged he is entitled to wages until the end of the voyage (April 10, 1951) less any wages he earned or could have earned. See Sabat v. United States, D.C., 72 F.Supp. 295, 297. Plaintiff was discharged on January 21, 1951 and returned to the United States in the middle of February, 1951. He went back to work as an able-bodied seaman on February 22, 1951.

The only damage which plaintiff sustained by reason of his unlawful discharge, other than cost of transportation, was loss of wages for one month, which it has been stipulated amounted to $248.41.

Plaintiff accordingly is entitled to judgment for $270.35 his earned wages and $4,968 penalty wages, amounting to $5,238.35 on his first cause of action, $135 on his third cause of action, $138.88 on his fourth cause of action and $248.41 on his fifth cause of action.