**Karl DAHL and Hjalmar Wiik, Libelants,**

**v.**

**THE S.S. AMIGO, her engines, boilers, tackle, apparel, furniture, etc., Respondent,**

**Caribbean Federation Lines, a Liberian Corporation, Claimant.**

**No. 2692.**

United States District Court
S. D. Alabama, S. D.
March 20, 1962.

Ross Diamond, Jr., Diamond, Engel & Lattof, Mobile, Ala., for libelants.

Hamilton, Denniston, Butler & Riddick, Mobile, Ala., for claimant.

DANIEL HOLCOMBE THOMAS, District Judge.

This is a cause of action brought by the libelants, Karl Dahl and Hjalmar Wiik, for wages, for damages as a result of a breach of the contract of employment, for penalty wages as provided by Title 46 U.S.C.A. § 596, for subsistence and repatriation expenses; and on behalf of libelant, Karl Dahl, who became ill while awaiting repatriation, for maintenance and cure.

## FINDINGS OF FACT

1. The libelants both signed one-year contracts of employment with the master of the SS AMIGO, Otto Henrichsen, in Bergen, Norway, on November 15, 1958. The contracts provided that they were to commence on that date and run through November 15, 1959. Libelant, Karl Dahl, was engaged as chief engineer for the SS AMIGO, a Liberian flag vessel, at wages of $400.00 a month; and libelant, Hjalmar Wiik, was engaged as chief mate of said vessel at wages of $300.00 a month. Upon Wiik's visiting the offices of the vessel's owner in New York City in the latter part of November 1958, his contract was amended to increase his wages to $325.00 per month.

2. The libelants joined the SS AMIGO on December 4, 1958, in the port of Pascagoula, Mississippi. At the time of their joining the vessel in Pascagoula, the crew of the vessel was not working because of a dispute over the payment of wages, and some of the vessel's gear and equipment, including the winches, were inoperative. The living conditions aboard the vessel were poor and the vessel generally was in a state of disrepair. Shortly thereafter difficulties with the crew were straightened out and repairs made upon the vessel's winches. Thereupon the cargo of the vessel, a cargo of heavy logs, was discharged. On December 13, 1958, the SS AMIGO departed from Pascagoula, Mississippi, bound for the Alabama Dry Dock at Mobile, Alabama. En route on this short voyage, the vessel's engines broke down and the SS AMIGO was towed by a tug on December 13 to the Alabama Dry Dock at Mobile, Alabama. Thereupon the entire crew of the vessel, with the exception of the master and the two libelants, was discharged.

3. The libelants remained aboard the vessel performing their duties until January 21, 1959, when they were advised by the master of the vessel that it was being laid up, that they were being discharged, and that they were to report to the company's offices in New York City.

Both of the libelants were given letters of recommendation by the master of the vessel, advising that their services had been satisfactory and that the reason for their separation of employment was that their vessel was being laid up. The libelants were wrongfully discharged, in that they were not discharged for a cause that would constitute a legal justification.

4. It is undisputed that the wages due to the libelants at the time of their discharge for services performed to date were for Karl Dahl the sum of $468.96; and for libelant, Hjalmar Wiik, the sum of $363.96. Upon presenting themselves to the offices of the vessel's owner, Caribbean Federation Shipping Line, in New York City on January 22, 1959, checks made out to the respective libelants covering the payment of these wages, plus $20.00 subsistence allowance to each officer, were tendered to the libelants. These checks bore the wording "final settlement, wages and maintenance, sign-off SS AMIGO." In addition, the president of the corporation owning the vessel had airplane tickets for return to Norway for both officers. However, neither the wages nor the transportation was unconditionally tendered, and in fact, these payments were conditioned upon both officers executing full releases, which had been prepared for their execution. The release of libelant Dahl read as follows:

"We herewith hand over to you our check in the amount of $488.96, covering your full wages, plus $20.00 maintenance.

"You fully agree that you are no longer under our employment and that you do not have, nor will you present any claims of any nature against the SS AMIGO, its owners or agents.

"Your contract has been terminated in this manner by mutual agreement."

The release called for the signatures of the vessel's agent and Karl Dahl, chief engineer. The release tendered to libelant Wiik for his execution was identical, except for the appropriate changes in the name and the amount of payment.

The libelants refused to accept the payments under the circumstances.

5. The libelants thereupon engaged the services of New York attorneys, who were unsuccessful in their efforts to obtain for the libelants their wages.

6. There has never been an unconditional tender of wages made to the libelants. Mr. Raoul Slavin, president of both the Kervin Shipping Corporation, the agents for the vessel, and of Caribbean Federation Shipping Line, the owner of the vessel, testified that when he discharged any seaman, the seaman was required to sign such a release as a condition of his obtaining wages then due.

7. The libelants remained in New York City awaiting repatriation until April 7, 1959. On this day, through the efforts of the United States Immigration and Naturalization Service, the vessel's owners or agents supplied airplane tickets to Norway to both of the libelants.

8. After the libelants had obtained the services of attorneys in New York City, and after considerable ill-feeling had been engendered, the vessel's representative made an offer of re-employment to both of the libelants. There was no offer of the payment of wages then due and neither officer accepted the offer of re-employment.

9. The libelants, while awaiting repatriation, incurred subsistence expenses in New York City for the first five-day period in the amount of $12.00 each. Thereafter, and for the remaining period they were in New York City, they obtained cheaper living accommodations and incurred subsistence expenses in the sum of $7.00 per day each. Libelant Karl Dahl became ill with pneumonia while he was awaiting repatriation and it was necessary that he be hospitalized in the Beekman-Downtown Hospital for the period March 27, 1959, through April 5, 1959, at a cost of $373.50.

10. Both libelants made numerous and repeated efforts to obtain employment both while awaiting repatriation in New

York City and upon their return to their native land of Norway. Libelant Hjalmar Wiik was unsuccessful in obtaining re-employment; libelant Karl Dahl was successful in obtaining 28 days of employment during the contract period terminating on November 15, 1959.

11. The libel in this cause was filed in this Court on February 6, 1959. The libelants' proctor, on March 9, 1959, filed a motion for priority in setting this cause down for hearing. The cause was set down for a pre-trial conference on December 1, 1959; and at that time the action was assigned its first trial date of February 26, 1960. For various reasons, thereafter the matter was continued from time to time until it was heard in court on February 3, 1961. The Court finds that with the exercise of due diligence by the libelants, this action could have been heard on February 26, 1960.

## CONCLUSIONS OF LAW

1. The Liberian Maritime Law, Sec. 30, is as follows:

"Adoption of General American Maritime Law. Insofar as it does not conflict with any other provision of this title, the nonstatutory general maritime law of the United States of America is hereby declared to be and is hereby adopted as the General Maritime Law of the Republic of Liberia."

No provisions of the Liberian Maritime Law have been presented to the Court governing in an action for breach of contract on a seaman's wage claim; therefore, the general maritime law of the United States would govern.

2. If a seaman be wrongfully discharged, even though the vessel is laid up due to lack of freight or because repairs are needed, the seaman is entitled to his full wages as called for in the contract. The City of New Orleans, C.C., 33 F. 683; The Mary, Fed.Cas.No. 9,186, 1 Paine 180; Forster v. Oro Navigation Company, D.C., 128 F.Supp. 113.

It is established law that upon the breach of a contract of employment, the employee must endeavor to mitigate his damages by seeking other employment; and if a bona fide offer of re-employment is made by the same employer, it must be accepted in mitigation of damages. An offer of re-employment must be a genuinely sincere and bona fide offer, made in good faith, to be considered in mitigation. Whitmarsh v. Littlefield, 46 Hun 418, 11 N.Y.S. 815. If there are reasonable grounds for rejection of an offer of re-employment, the discharged employee is under no obligation to accept re-employment. Levin v. Standard Fashion Company, 16 Daly 404, 11 N.Y.S. 706. If anything has occurred that would render further association between the parties offensive, then in that event, the employee is not obligated to accept the offer of re-employment. Levin v. Standard Fashion Company, supra; Birdsong v. Ellis, 62 Miss. 418; Connell v. Averill, 8 App.Div. 524, 40 N.Y.S. 855. The Court is not convinced that there was a sincere bona fide offer of re-employment. However, if the offer of re-employment was such, the Court is of the opinion that the existing circumstances (that is, the wrongful discharge, the living conditions that prevailed aboard the vessel, the fact that there was no unconditional tender of wages along with the offer of re-employment, the ill-feeling that had been engendered, and the fact that libelants had engaged the services of attorneys) constituted reasonable grounds for the libelants' rejection of the offer of re-employment.

3. It is well settled in the field of maritime law that a seaman is entitled to maintenance and to subsistence and repatriation upon being discharged from his vessel.

4. Title 46 U.S.C.A. § 596, provides that the failure to pay seamen's wages as therein specified, without sufficient cause, shall entitle the seaman to a sum equal to two days' pay for each and every day that the payment is withheld. This statute has consistently been held to apply to foreign seamen on foreign flag vessels. The Fletero v. Arias, 4

Cir., 206 F.2d 267, certiorari denied 346 U.S. 897, 74 S.Ct. 220, 98 L.Ed. 398; The Sonderborg, 4 Cir., 47 F.2d 723.

■ ■ The tender of wages upon a condition other than the signing of a receipt for the money received is not a sufficient tender to stop the penalty provision. Certainly, a tender of wages upon condition that a full release be signed, will not stop the penalty provision, but will in fact invoke the penalty provision. Prindes v. The S. S. African Pilgrim, 4 Cir., 266 F.2d 125; Mandelin et al. v. Kenneally et al., 4 Cir., 11 F.2d 344; Forster v. Oro Navigation Company, supra.

In Mandelin et al. v. Kenneally et al., supra, in a fact situation similar at least in respect to its being a conditional tender of wages, the appellate court held as follows:

"This the respondent could not do [withhold amounts admittedly due libelants at the end of their voyage, unless libelants would accept the same upon the conditions imposed by respondent] as it constituted neither a payment of the wages nor a lawful tender of the amount due, but, on the contrary, a proffer of a future law suit respecting the same. The fact that, in the litigation that followed in this particular case, the court sustained respondent's claim to withhold the fines and penalties imposed, would not warrant the imposition of any such condition or penalty as was sought to be imposed. The only effect of libelants' accepting the payment of the wages upon the condition prescribed would have been to surrender their claims entirely.

＊ ＊ ＊ ＊ ＊ ＊

"If this important provision of the statute looking to securing for seamen the prompt payment of wages due them could be lightly avoided by the ship's prescribing conditions like those in this case, it would work an easy avoidance of a most important provision of the law enacted for the protection of seamen."

■ ■ Although the statute would seem to indicate that the penalty provision should run until actual payment is in fact made, it appears to be the accepted rule of law that the time for which the penalty provision runs shall rest within the sound discretion of the court, depending upon and to be determined by the equities of the particular case. Mavromatis v. United Greek Shipowners Corporation, 1 Cir., 179 F.2d 310; Prindes v. The S. S. African Pilgrim, supra; Forster v. Oro Navigation Company, supra. Upon review of the many cases holding that the penalty provision should run to various and different specified periods of time, it appears that an effort should be made to stabilize this feature of the penalty wage statute. Unless the particular equities in the given case would dictate otherwise, I believe the rule should be that the penalty provision shall run until such time as the libelant with the exercise of due diligence could have brought his action on to be heard in court. Forster v. Oro Navigation Company, supra. The Victoria, D.C., 76 F. Supp. 54.

I have heretofore found that with the exercise of due diligence by the libelants this action could have been heard on February 26, 1960. Should that date be conclusive, mathematical calculations would indicate that Dahl would be entitled to $15,299.74, and that Wiik would be entitled to $12,654.70.[1] However, as in the Forster case, supra, I feel that the equities in the matter dictate some modi-

1. Libelant Karl Dahl, at the time of his discharge, January 21, 1959, was entitled to wages due in the amount of $468.96. Wages for the breach of contract through November 1959, a period of 8 months, 26 days (deducting the 28 days that the libelant had other employment), figured at $400.00 per month, total $3,546.58. Subsistence for the period January 23, 1959, through January 27, 1959, 5 days at $12.00 per day, totals $60.00; and for the period beginning January 28, 1959, and running through April 7, 1959 (deducting the 10-day period he was an in-

fication. A more realistic appraisal would be to award a judgment in favor of Dahl in the amount of $13,299.74, and a judgment in favor of Wiik in the amount of $10,654.70.

Judgments will be entered accordingly.

patient of the hospital) 60 days' subsistence at $7.00 per day totals $420.00. Costs of Dahl's cure total $373.50. Thirteen months or 395 days of penalty wages beginning January 26, 1959, and running through February 26, 1960, doubling said 395 days, make a total of 790 days at $13.33 per day, or $10,530.70 for penalty wages. The total award, so calculated, to said libelant, Karl Dahl, would be in the amount of $15,299.74.

Libelant Hjalmar Wiik was entitled to wages due at the time of his discharge, January 21, 1959, in the amount of $363.96. Wages for the breach of contract through November 15, 1959, a period of 9 months, 24 days, figured at $325.-00 per month, total $3,185.04. Subsistence for the period January 23, 1959, through January 27, 1959, 5 days at $12.00 per day, totals $60.00; and for the period beginning January 28, 1959, and running through April 7, 1959, 70 days at $7.00 per day, totals $490.00. Thirteen months or 395 days' penalty wages beginning January 26, 1959, and running through February 26, 1960, doubling said 395 days, make a total of 790 days at $10.83 per day, or $8,555.70 for penalty wages. The total award, so calculated, to the said libelant, Hjalmar Wiik, would be in the amount of $12,654.-70.