# GRIFFIN *v.* OCEANIC CONTRACTORS, INC.

No. 81–614.   Argued April 26, 1982—Decided June 30, 1982

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, POWELL, and O'CONNOR, JJ., joined. STEVENS, J., filed a dissenting opinion, in which BLACKMUN, J., joined, *post*, p. 577.

*Robert A. Chaffin* argued the cause and filed briefs for petitioner.

*Theodore Goller* argued the cause and filed a brief for respondent.

JUSTICE REHNQUIST delivered the opinion of the Court.

This case concerns the application of 46 U. S. C. § 596, which requires certain masters and vessel owners to pay seamen promptly after their discharge and authorizes seamen to

recover double wages for each day that payment is delayed without sufficient cause. The question is whether the district courts, in the exercise of discretion, may limit the period during which this wage penalty is assessed, or whether imposition of the penalty is mandatory for each day that payment is withheld in violation of the statute.

## I

On February 18, 1976, petitioner signed an employment contract with respondent in New Orleans, agreeing to work as a senior pipeline welder on board vessels operated by respondent in the North Sea. The contract specified that petitioner's employment would extend "until December 15, 1976 or until Oceanic's 1976 pipeline committal in the North Sea is fulfilled, whichever shall occur first." App. 41. The contract also provided that respondent would pay for transportation to and from the worksite, but that if petitioner quit the job prior to its termination date, or if his services were terminated for cause, he would be charged with the cost of transportation back to the United States. Respondent reserved the right to withhold $137.50 from each of petitioner's first four paychecks "as a cash deposit for the payment of your return transportation in the event you should become obligated for its payment." Id., at 47. On March 6, 1976, petitioner flew from the United States to Antwerp, Belgium, where he reported to work at respondent's vessel, the "Lay Barge 27," berthed in the Antwerp harbor for repairs.

On April 1, 1976, petitioner suffered an injury while working on the deck of the vessel readying it for sea. Two days later he underwent emergency surgery in Antwerp. On April 5, petitioner was discharged from the hospital and went to respondent's Antwerp office, where he spoke with Jesse Williams, the welding superintendent, and provided a physician's statement that he was not fit for duty. Williams refused to acknowledge that petitioner's injury was work-

related and denied that respondent was liable for medical and hospital expenses, maintenance, or unearned wages. Williams also refused to furnish transportation back to the United States, and continued to retain $412.50 in earned wages that had been deducted from petitioner's first three paychecks for that purpose. Petitioner returned to his home in Houston, Tex., the next day at his own expense. He was examined there by a physician who determined that he would be able to resume work on May 3, 1976. On May 5, petitioner began working as a welder for another company operating in the North Sea.

In 1978 he brought suit against respondent under the Jones Act, § 20, 38 Stat. 1185, as amended, 46 U. S. C. § 688, and under general maritime law, seeking damages for respondent's failure to pay maintenance, cure, unearned wages, repatriation expenses, and the value of certain personal effects lost on board respondent's vessel. Petitioner also sought penalty wages under Rev. Stat. § 4529, as amended, 46 U. S. C. § 596, for respondent's failure to pay over the $412.50 in earned wages allegedly due upon discharge. The District Court found for petitioner and awarded damages totalling $23,670.40.

Several findings made by that court are particularly relevant to this appeal. First, the court found that petitioner's injury was proximately caused by an unseaworthy condition of respondent's vessel. App. 17, ¶10; 23, ¶6. Second, the court found that petitioner was discharged from respondent's employ on the day of the injury, and that the termination of his employment was caused solely by that injury. Id., at 18, ¶16; 23, ¶7.[1] Third, it found that respondent's failure to pay petitioner the $412.50 in earned wages was "without suffi-

---

[1] According to respondent, petitioner was not formally discharged until June 1, 1976, but his termination was made retroactive to April 1. Brief for Respondent 5.

cient cause." *Id.*, at 20, ¶ 20; 25, ¶ 11.[2]   Finally, the court found that petitioner had exercised due diligence in attempting to collect those wages. *Id.*, at 20, ¶ 21.

In assessing penalty wages under 46 U. S. C. § 596, the court held that "[t]he period during which the penalty runs is to be determined by the sound discretion of the district court and depends on the equities of the case." App. 25, ¶ 11.   It determined that the appropriate period for imposition of the penalty was from the date of discharge, April 1, 1976, through the date of petitioner's reemployment, May 5, 1976, a period of 34 days.   Applying the statute, it computed a penalty of $6,881.60.[3]   Petitioner appealed the award of damages as inadequate.

The Court of Appeals for the Fifth Circuit affirmed.   664 F. 2d 36 (1981).   That court concluded, *inter alia*, that the District Court had not erred in limiting assessment of the penalty provided by 46 U. S. C. § 596 to the period beginning April 1 and ending May 5.   The court recognized that the statute required payment of a penalty for each day during which wages were withheld until the date they were actually paid, which in this case did not occur until September 17, 1980, when respondent satisfied the judgment of the District Court.   *Id.*, at 40; see App. 30.   Nevertheless, the court believed itself bound by prior decisions within the Circuit, which left calculation of the penalty period to the sound discretion of the district courts.   664 F. 2d, at 40.   It concluded

---

[2] The court also found:

"Defendant did not begin a thorough investigation of plaintiff's claim until September 30, 1976.   The investigation was not made with reasonable diligence.   Defendant's failure to pay maintenance and cure, repatriation expenses, the cost of his personal effects, and earned and unearned wages to plaintiff constituted arbitrary, unreasonable, callous, and willful disregard of plaintiff's rights." App. 20, ¶ 21.

[3] The court found that the daily wage rate to be used in calculating the penalty was $101.20.   In accordance with the statute, the court assessed a penalty of twice this rate ($202.40) for each of the 34 days of the penalty period.

that the District Court in this case had not abused its discretion by assessing a penalty only for the period during which petitioner was unemployed.

We granted certiorari to resolve a conflict among the Circuits regarding the proper application of the wage penalty statute.[4]   454 U. S. 1052 (1981).   We reverse the judgment of the Court of Appeals as to that issue.[5]

## II

## A

The language of the statute first obligates the master or owner of any vessel making coasting or foreign voyages to pay every seaman the balance of his unpaid wages within specified periods after his discharge.[6]   It then provides:

---

[4] The Courts of Appeals for the Third and Ninth Circuits have interpreted the statute to mandate imposition of the penalty for each day until the wages are paid and to leave no room for the district court's exercise of discretion.   *Swain* v. *Isthmian Lines, Inc.*, 360 F. 2d 81 (CA3 1966); *Larkins* v. *Hudson Waterways Corp.*, 640 F. 2d 997 (CA9 1981); *Thomas* v. *SS Santa Mercedes*, 572 F. 2d 1331 (CA9 1978).   The Courts of Appeals for the First, Second, and Fourth Circuits have adopted the interpretation followed by the Fifth Circuit.   *Mavromatis* v. *United Greek Shipowners Corp.*, 179 F. 2d 310 (CA1 1950); *Forster* v. *Oro Navigation Co.*, 228 F. 2d 319 (CA2 1955), aff'g 128 F. Supp. 113 (SDNY 1954); *Southern Cross S.S. Co.* v. *Firipis*, 285 F. 2d 651 (CA4 1960), cert. denied, 365 U. S. 869 (1961). We noted this conflict in *American Foreign S.S. Co.* v. *Matise*, 423 U. S. 150, 152, n. 1 (1975).

[5] Petitioner has not questioned the other holdings of the Court of Appeals in his case.   Respondent did not appeal from the judgment of the District Court and has not cross-petitioned for certiorari here.

[6] The statute reads in full:

"The master or owner of any vessel making coasting voyages shall pay to every seaman his wages within two days after the termination of the agreement under which he was shipped, or at the time such seaman is discharged, whichever first happens; and in case of vessels making foreign voyages, or from a port on the Atlantic to a port on the Pacific, or vice versa, within twenty-four hours after the cargo has been discharged, or within four days after the seaman has been discharged, whichever first happens; and in all cases the seaman shall be entitled to be paid at the time

"Every master or owner who refuses or neglects to make payment in the manner hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the respective periods . . . ."

The statute in straightforward terms provides for the payment of double wages, depending upon the satisfaction of two conditions. First, the master or owner must have refused or failed to pay the seaman his wages within the periods specified. Second, this failure or refusal must be "without sufficient cause." Once these conditions are satisfied, however, the unadorned language of the statute dictates that the master or owner "*shall pay* to the seaman" the sums specified "*for each and every day* during which payment is delayed." The words chosen by Congress, given their plain meaning, leave no room for the exercise of discretion either in deciding whether to exact payment or in choosing the period of days by which the payment is to be calculated. As this Court described the statute many years ago, it "affords a definite and reasonable procedure by which the seaman may establish his right to recover double pay where his wages are unreasonably withheld." *McCrea* v. *United States*, 294 U. S. 23, 32 (1935). Our task is to give effect to the will of Congress, and where its will has been expressed in reasonably plain terms, "that language must ordinarily be regarded as conclusive." *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.*, 447 U. S. 102, 108 (1980).

---

of his discharge on account of wages a sum equal to one-third part of the balance due him. Every master or owner who refuses or neglects to make payment in the manner hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the respective periods, which sum shall be recoverable as wages in any claim made before the court; but this section shall not apply to masters or owners of any vessel the seamen of which are entitled to share in the profits of the cruise or voyage. This section shall not apply to fishing or whaling vessels or yachts."

The District Court found that respondent had refused to pay petitioner the balance of his earned wages promptly after discharge, and that its refusal was "without sufficient cause." Respondent challenges neither of these findings. Although the two statutory conditions were satisfied, however, the District Court obviously did not assess double wages "for each and every day" during which payment was delayed, but instead limited the assessment to the period of petitioner's unemployment. Nothing in the language of the statute vests the courts with the discretion to set such a limitation.

## B

Nevertheless, respondent urges that the legislative purpose of the statute is best served by construing it to permit some choice in determining the length of the penalty period. In respondent's view, the purpose of the statute is essentially remedial and compensatory, and thus it should not be interpreted literally to produce a monetary award that is so far in excess of any equitable remedy as to be punitive.

Respondent, however, is unable to support this view of legislative purpose by reference to the terms of the statute. "There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes." *United States* v. *American Trucking Assns., Inc.*, 310 U. S. 534, 543 (1940). See *Caminetti* v. *United States*, 242 U. S. 470, 490 (1917). Nevertheless, in rare cases the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters, and those intentions must be controlling. We have reserved "some 'scope for adopting a restricted rather than a literal or usual meaning of its words where acceptance of that meaning . . . would thwart the obvious purpose of the statute.' " *Commissioner* v. *Brown*, 380 U. S. 563, 571 (1965) (quoting *Helvering* v. *Hammel*, 311 U. S. 504, 510–511 (1941)). This, however, is not the exceptional case.

As the Court recognized in *Collie* v. *Fergusson*, 281 U. S. 52 (1930), the "evident purpose" of the statute is "to secure prompt payment of seamen's wages . . . and thus to protect them from the harsh consequences of arbitrary and unscrupulous action of their employers, to which, as a class, they are peculiarly exposed." *Id.*, at 55. This was to be accomplished "by the imposition of a liability which is not exclusively compensatory, but designed to prevent, by its coercive effect, arbitrary refusals to pay wages, and to induce prompt payment when payment is possible." *Id.*, at 55–56. Thus, although the sure purpose of the statute is remedial, Congress has chosen to secure that purpose through the use of potentially punitive sanctions designed to deter negligent or arbitrary delays in payment.

The legislative history of the statute leaves little if any doubt that this understanding is correct. The law owes its origins to the Act of July 20, 1790, ch. 29, § 6, 1 Stat. 133, passed by the First Congress. Although the statute as originally enacted gave every seaman the right to collect the wages due under his contract "as soon as the voyage is ended," it did not provide for the recovery of additional sums to encourage compliance. Such a provision was added by the Shipping Commissioners Act of 1872, ch. 322, § 35, 17 Stat. 269, which provided for the payment of "a sum not exceeding the amount of two days' pay for each of the days, not exceeding ten days, during which payment is delayed." The Act of 1872 obviously established a ceiling of 10 days on the period during which the penalty could be assessed and, by use of the words "not exceeding," left the courts with discretion to choose an appropriate penalty within that period.[7]

---

[7] The Act of 1790 and the Act of 1872 provided the basis for § 4529 of the Revised Statutes, codified in 1878. Section 4529 read as follows:

"The master or owner of every vessel making voyages from a port on the Atlantic to a port on the Pacific, or vice versa, shall pay to every seaman his wages, within two days after the termination of the agreement, or at the time such seaman is discharged, whichever first happens; and, in the

Congress amended the law again in 1898. As amended, it read in relevant part:

"Every master or owner who refuses or neglects to make payment in manner hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to one day's pay for each and every day during which payment is delayed beyond the respective periods." Act of Dec. 21, 1898, ch. 28, §4, 30 Stat. 756.

The amending legislation thus effected two changes: first, it removed the discretion theretofore existing by which courts might award less than an amount calculated on the basis of each day during which payment was delayed, and, second, it removed the 10-day ceiling which theretofore limited the number of days upon which an award might be calculated. The accompanying Committee Reports identify the purpose of the legislation as "the amelioration of the condition of the American seamen," and characterize the amended wage penalty in particular as "designed to secure the promptest possible payment of wages." H. R. Rep. No. 1657, 55th Cong., 2d Sess., 2, 3 (1898). See also S. Rep. No. 832, 54th Cong., 1st Sess., 2 (1896).[8] Nothing in the legislative history of the

---

case of vessels making foreign voyages, within three days after the cargo has been delivered, or within five days after the seaman's discharge, whichever first happens; and in all cases the seaman shall, at the time of his discharge, be entitled to be paid, on account, a sum equal to one-fourth part of the balance due him. Every master or owner who neglects or refuses to make payment in manner hereinbefore mentioned, without sufficient cause, shall pay to the seaman a sum not exceeding the amount of two days' pay for each of the days, not exceeding ten days, during which payment is delayed beyond the respective periods; which sum shall be recoverable as wages in any claim made before the court. But this section shall not apply to the masters or owners of any vessel the seamen on which are entitled to share in the profits of the cruise or voyage."

[8] The 1898 Act was substantially identical to legislation that had passed the House in the previous Congress, and had been favorably reported in the Senate, but had failed to come to a vote before the end of the session. Thus, the House Report of the legislation enacted in 1898 contained little

1898 Act suggests that Congress intended to do anything other than what the Act's enacted language plainly demonstrates: to strengthen the deterrent effect of the statute by removing the courts' latitude in assessing the wage penalty.

The statute was amended for the last time in 1915 to increase further the severity of the penalty by doubling the wages due for each day during which payment of earned wages was delayed. Seamen's Act of 1915, ch. 153, § 3, 38 Stat. 1164. There is no suggestion in the Committee Reports or in the floor debates that, in so doing, Congress intended to reinvest the courts with the discretion it had removed in the Act of 1898. Resort to the legislative history, therefore, merely confirms that Congress intended the statute to mean exactly what its plain language says.

## III

Respondent argues, however, that a literal construction of the statute in this case would produce an absurd and unjust result which Congress could not have intended. The District Court found that the daily wage to be used in computing the penalty was $101.20. If the statute is applied literally, petitioner would receive twice this amount for each day after his discharge until September 17, 1980, when respondent satisfied the District Court's judgment.[9] Petitioner would re-

more than a reproduction of the House Report of the previous Congress, and the relevant Senate Report also dates from that Congress.

[9] Respondent assumes that the penalty would run until September 17, 1980, since that was the date on which it finally paid petitioner the $412.50. Brief for Respondent 17. Petitioner, on the other hand, apparently assumes that the penalty period expired on May 6, 1980, the date of the District Court's judgment. Brief for Petitioner 19. Under our construction of the statute, the District Court's entry of judgment will not toll the running of the penalty period unless delays beyond that date are explained by sufficient cause. See Pacific Mail S.S. Co. v. Schmidt, 241 U. S. 245, 250–251 (1916) (holding that when an appeal is taken on reasonable grounds, the penalty should not apply to delays in payment beyond the date on which the district court's decree is entered, since those delays are supported by sufficient cause). The Court of Appeals for the Fourth Cir-

ceive over $300,000 simply because respondent improperly withheld $412.50 in wages. In respondent's view, Congress could not have intended seamen to receive windfalls of this nature without regard to the equities of the case.

It is true that interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available. See *United States* v. *American Trucking Assns., Inc.*, 310 U. S., at 542–543; *Haggar Co.* v. *Helvering*, 308 U. S. 389, 394 (1940). In refusing to nullify statutes, however hard or unexpected the particular effect, this Court has said:

> "Laws enacted with good intention, when put to the test, frequently, and to the surprise of the law maker himself, turn out to be mischievous, absurd or otherwise objectionable. But in such case the remedy lies with the law making authority, and not with the courts." *Crooks* v. *Harrelson*, 282 U. S. 55, 60 (1930).

It is highly probable that respondent is correct in its contention that a recovery in excess of $300,000 in this case greatly exceeds any actual injury suffered by petitioner as a result of respondent's delay in paying his wages. But this Court has previously recognized that awards made under this statute were not intended to be merely compensatory:

> "We think the use of this language indicates a purpose to protect seamen from delayed payments of wages by the imposition of a liability which is not exclusively compensatory, but designed to prevent, by its coercive effect, arbitrary refusals to pay wages, and to induce prompt payment when payment is possible." *Collie* v. *Fergusson*, 281 U. S., at 55–56.

cuit, in *Southern Cross S.S. Co.* v. *Firipis*, 285 F. 2d, at 660, and the Court of Appeals for the Third Circuit in *Swain* v. *Isthmian Lines, Inc.*, 360 F. 2d, at 88, n. 26, have interpreted this Court's decision in *Pacific Mail* to permit the employer to toll the running of the penalty period by placing in the hands of the court the allegedly unlawfully withheld wages.

It is in the nature of punitive remedies to authorize awards that may be out of proportion to actual injury; such remedies typically are established to deter particular conduct, and the legislature not infrequently finds that harsh consequences must be visited upon those whose conduct it would deter. It is probably true that Congress did not precisely envision the grossness of the difference in this case between the actual wages withheld and the amount of the award required by the statute. But it might equally well be said that Congress did not precisely envision the trebled amount of some damages awards in private antitrust actions, see *Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 344–345 (1979), or that, because it enacted the Endangered Species Act, "the survival of a relatively small number of three-inch fish . . . would require the permanent halting of a virtually completed dam for which Congress ha[d] expended more than $1 million," *TVA* v. *Hill*, 437 U. S. 153, 172 (1978). It is enough that Congress intended that the language it enacted would be applied as we have applied it. The remedy for any dissatisfaction with the results in particular cases lies with Congress and not with this Court. Congress may amend the statute; we may not. See *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.*, 447 U. S., at 123–124; *Reiter* v. *Sonotone, supra*, at 344–345.

Finally, we note that our holding is consistent with *Pacific Mail S.S. Co.* v. *Schmidt*, 241 U. S. 245 (1916). The employer in that case challenged a decision by the Court of Appeals to apply the wage penalty to the delay after the District Court's judgment occasioned by the employer's appeal. The Court held that on the facts of that case, application of the penalty beyond the date of the District Court's judgment was error. Contrary to respondent's assertion, however, the holding does not reflect the discretionary tailoring of the penalty to the equities of the case. Instead, the Court held that the delay pending appeal was not "without sufficient cause," as required by the statute before the penalty can attach.

*Id.*, at 250.[10]   As we explained earlier, a condition to the imposition of the wage penalty is a finding that the delay in payment is "without sufficient cause."   To the extent that the equities of the situation are to be considered, see *Collie* v. *Fergusson, supra,* they bear on that finding, and not on the calculation of the penalty period once that finding has been made.

## IV

The District Court found that respondent's refusal to pay petitioner earned wages following his discharge was without sufficient cause.   It applied the wage penalty only for the period of nonpayment during which petitioner was unable to work.   It made no finding, however, that respondent's continuing delay in payment beyond that period was for sufficient cause.   Under the plain language of the statute, therefore, its decision to limit the penalty period was error.   The judgment of the Court of Appeals affirming that decision accordingly is reversed, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE BLACKMUN joins, dissenting.

In final analysis, any question of statutory construction requires the judge to decide how the legislature intended its enactment to apply to the case at hand.   The language of the statute is usually sufficient to answer that question, but "the reports are full of cases" in which the will of the legislature is not reflected in a literal reading of the words it has chosen.[1] In my opinion this is such a case.

---

[10] The Court found that the employer "had strong and reasonable ground for believing that the statute ought not to be held to apply," 241 U. S., at 250, because the work for which the seaman claimed unpaid wages did not occur during a voyage and was the result of an oral contract.

[1] "It is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the

Qualifying language in 46 U. S. C. § 596 supports a much narrower construction than the Court adopts. For over 50 years after the statute's most recent amendment in 1915, federal judges consistently construed it to avoid the absurd result the Court sanctions today. Their reading of the statute was consistent with the specific purposes achieved by the amendments in 1898 and 1915, as well as with the meaning of the statute when an award for unearned wages was first authorized.

I

On April 1, 1976, petitioner, a welder, suffered a temporarily disabling injury aboard respondent's vessel. On April 5, 1976, petitioner met with respondent's welding superintendent, who refused to acknowledge that respondent was responsible for the injury and who also refused to pay petitioner $412.50 in earned wages. Petitioner fully recovered from the injury by May 3, 1976, and two days later obtained comparable work with another employer. He filed this action on February 3, 1978. It is now settled that respondent was responsible for petitioner's injury and that respondent wrongfully refused to pay him $412.50 on April 5, 1976.

The question of statutory construction that is before us is what "sum shall be recoverable as wages" to compensate petitioner for respondent's refusal to pay him $412.50 on April 5, 1976. 46 U. S. C. § 596.[2] The District Court computed that sum by doubling his daily wage of $101.20 and multi-

intention of its makers. This has been often asserted, and the reports are full of cases illustrating its application. This is not the substitution of the will of the judge for that of the legislator, for frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act." *Holy Trinity Church* v. *United States*, 143 U. S. 457, 459 (1892).

[2] The statute is quoted in full, *ante*, at 569–570, n. 6.

plying that amount by 34—the number of days between the injury on April 1 and petitioner's reemployment on May 5, 1976. The District Court's award thus amounted to $6,881.60.[3] This Court holds that the sum recoverable as wages amounts to at least $302,790.40.[4]

## II

In pertinent part, § 596 provides as follows:

"Every master or owner who refuses or neglects to make payment [of a seaman's earned wages within four days after the seaman's discharge] without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the [4-day period], *which sum shall be recoverable as wages* in any claim made before the court . . . ."[5] (Emphasis added.)

The text of the statute admittedly supports the construction given it by the Court—if there was not sufficient cause for the refusal to make payment within four days of the discharge, then the seaman is entitled to double wages for the entire period between the fourth day and the date the payment is finally made. The statute, however, is susceptible of another interpretation. Indeed, for a half century following its latest amendment the federal courts, including this Court,

---

[3] The Court of Appeals held that the award did not constitute an abuse of discretion. 664 F. 2d 36, 40 (CA5 1981).

[4] This figure is computed by reference to the period between April 1, 1976 (date of discharge), and May 6, 1980 (date of judgment). But see *ante*, at 574–575, n. 9.

[5] The Court omits the italicized clause of the statute when it quotes the statute in the text of its opinion. *Ante*, at 570 and 573. Because wage claims, unlike penalties, have consistently been accorded a high priority in insolvency proceedings against employers, it seems to me the clause is pertinent to our task of discerning the intent of Congress in authorizing an award of double wages. See also *infra*, at 582–583.

consistently exercised some discretion in determining the sum recoverable as wages under this section.

## A

In fixing the amount of the award of double wages, the District Court in this case may have reasoned that respondent had sufficient cause for its delay in paying the earned wages after petitioner obtained employment with another shipmaster, but that there was not sufficient cause for its failure to make payment before that time. Although this reasoning conflicts with a literal reading of § 596, it is perfectly consistent with this Court's contemporary construction of the statute in *Pacific Mail S.S. Co.* v. *Schmidt*, 241 U. S. 245 (1916). The teaching of Justice Holmes' opinion for the Court in that case is that the wrongful character of the initial refusal to pay does not mean that all subsequent delay in payment is also "without sufficient cause" within the meaning of the statute.

The controversy in *Pacific Mail* arose in 1913, when the statute provided that the sum recoverable as wages was measured by one day's pay, rather than double that amount, for each day that the wages were withheld without sufficient cause; the statute was otherwise exactly as it is today. The seaman was discharged on October 1, 1913, but $30.33 was withheld from his wages because he was believed responsible for the loss of some silverware. He filed an action on October 20, 1913, and on November 5, 1913, obtained a judgment for his wages and an additional sum of $151.59, representing the sum recoverable as wages for the period between October 1 and November 5, 1913. The District Court's decree established the proposition that the vessel owner's defenses did not constitute sufficient cause for refusing to pay the wages and requiring the seaman to sue to recover them.

The vessel owner prosecuted an unsuccessful appeal. The Court of Appeals not only affirmed the decision of the District Court, but also added an additional recovery of daily wages for the period between the entry of the original judg-

ment on November 5 and the actual payment of the disputed wages. The Court of Appeals thus read the statute literally and ordered the result that the District Court's finding seemed to dictate. This Court, however, set aside the additional recovery, reaching a conclusion that cannot be reconciled with a wooden, literal reading of the statute. Concurrent findings of the District Court and the Court of Appeals established that the refusal to make the wage payment when due was without sufficient cause. Justice Holmes and his Brethren accepted that finding for purposes of decision, but reasoned that there was sufficient cause for the owner's decision to appeal and his refusal to pay while the appeal was pending.

The curious character of this Court's conclusion that reasons insufficient to justify the refusal to pay before the trial court's decision somehow became sufficient to justify a subsequent refusal to pay is not the most significant point to Justice Holmes' opinion. The case is primarily significant because its holding cannot be squared with a literal reading of the statute.[6] Even though the initial refusal is without sufficient cause, statutory wages are not necessarily recoverable for the entire period until payment is made either to the seaman or to a stakeholder.[7] A subsequent event—even

---

[6] In a petition for rehearing, after pointing out that the Court had adopted an interpretation of the statute that had not been urged in any of the briefs or in any of the opinions of the lower courts, the seaman argued:

"According to the grammatical, natural and unambiguous meaning conveyed by the words of section 4529, R. S., Congress has limited the running of penalties only by a 'sufficient cause' for original non-payment of earned wages—a sufficient cause operating to prevent penalties from ever beginning to accrue; once these penalties begin to run, nothing short of actual payment or tender can suffice to prevent the continuous accrual of the per diem penalties." Pet. for Rehearing, O. T. 1915, No. 323, p. 5.

[7] Petitioner argues that literal application of § 596 will not yield harsh results because the shipmaster may toll the period of delay by tendering the disputed wage claim into the registry of the court. Brief for Petitioner 27. In petitioner's words, the master may make a "constructive payment

though not expressly mentioned in the statute itself—may foreshorten the recovery period.

In *Pacific Mail* the subsequent event was the vessel owner's decision to appeal. The finding that that event provided sufficient cause for the delay after November 5, 1913, was made *sua sponte* by this Court. In this case the subsequent event was the reemployment of petitioner in a comparable job on May 5, 1976. The finding that that event—coupled with the failure to make any additional demand for almost two years thereafter—was sufficient cause for the delay after May 5, 1976, was made by the District Court. It is true that the judge did not expressly frame his decision in these terms, but his actual decision fits precisely the mold established by *Pacific Mail*. Both cases give a flexible reading to the "sufficient cause" language in the statute. They differ with respect to the nature of the subsequent event but not with respect to their departure from the statutory text.[8]

B

The second case in which this Court construed § 596, *Collie* v. *Fergusson*, 281 U. S. 52 (1930), also focused on the meaning of the phrase "without sufficient cause." In that case the unpaid seamen claimed that the financial necessities of the owner could not constitute sufficient cause for delay in wage payments; that contention was surely consistent with the plain language of the statute. This Court nevertheless denied recovery, construing the statute as implicitly containing a requirement that the refusal be "in some sense arbitrary or

---

of wages." *Id.*, at 28. The Court seems to accept this argument. · See *ante*, at 574–575, n. 9. Neither petitioner nor the Court seems to recognize that acceptance of this minimal tolling rule conflicts with a literal reading of the statute. A tender of wages to the court is a "constructive payment of wages" only because a court has added that reasonable gloss to the statute.

[8] If the Court today were to read *Pacific Mail* as requiring that the subsequent-event finding be made expressly, I would either follow Justice Holmes' lead by making a comparable finding in this Court or I would remand to the District Court for additional findings on this issue.

wilful, or at least a failure not attributable to impossibility of payment." *Id.*, at 55. The Court adopted this nonliteral construction of the statute because it recognized the significance of the provision that a seaman's double-wage claim "shall be recoverable as wages in any claim made before the Court." See *id.*, at 54. In any proceeding arising out of the insolvency of the vessel owner, this provision accords this type of claim priority over general creditors and various lienors who have stronger equitable claims on limited assets. The construction of the words "without sufficient cause" to narrow the protection of the statute was consistent with the intent of Congress even though it involved a rather flexible reading of the text of the statute itself.[9]

This Court's third occasion to interpret § 596 was *McCrea* v. *United States*, 294 U. S. 23 (1935), and, once again, the Court construed the statute narrowly, this time by taking a literal approach. In that case the seaman, citing specific sections of federal legislation, demanded from the shipmaster his discharge, his earned wages, and other benefits. The master was unfamiliar with the cited sections and asked the seaman to meet with him at noon the next day for an informed discussion of the demands. The seaman missed the appointment and left the country without contacting the master. After his return to the United States, the seaman filed an action in which he claimed entitlement to, *inter alia*, his earned wages and double wages for the delay in payment. The District Court, affirmed by the Court of Appeals, held that the owner of the ship, the United States, was immune from the double-wage provision of § 596 because the double wages con-

---

[9] The District Court's finding of arbitrariness in this case—which, in view of the holding in *Collie*, was necessary if any penalty wage were to be recovered—must be read in the context of its actual award. It was not clearly erroneous to find that the refusal to pay petitioner $412.50 was arbitrary while he was unemployed; it surely was not equally arbitrary during the ensuing 2-year period when he was employed by a competitor and did not renew his demand.

stituted a penalty. This Court granted the seaman's petition for certiorari, but avoided decision of the sovereign immunity question by holding that there was sufficient cause for the failure of the shipmaster to make the wage payment within four days of the seaman's discharge. The Court then rejected the seaman's rather reasonable argument that even if the shipmaster had cause to withhold payment during those four days, there was not sufficient cause for the continued refusal once the seaman filed his action and formally made his claim to earned wages. The Court, without citing *Pacific Mail*, held that if the master's failure to pay earned wages at the time specified in the statute was justified by sufficient cause, the fact that he later refused to pay pursuant to a proper demand could not give rise to statutory liability even though there was no sufficient cause for the subsequent refusal.

These early interpretations of § 596 dispel any notion that the statute means exactly what it says. The Court has construed the statute "to effect its purpose," *Isbrandtsen Co.* v. *Johnson*, 343 U. S. 779, 783 (1952), and, as the early cases demonstrate, the purpose of the statute does not always require the award of double wages in the amount that the statute literally specifies.

<h2 style="text-align:center">C</h2>

Flexibility also has characterized the applications of the statute rendered by the lower federal courts. For decades those courts consistently concluded that Congress intended to allow judicial discretion to play a part in determining the amount of the double-wage recovery.[10] Whether those deci-

---

[10] See *Mystic S.S. Co.* v. *Stromland*, 20 F. 2d 342, 344 (CA4) ("The District Court, by limiting the right of recovery to 10 days after the libel was filed, in effect placed a limitation on the amount of the recovery under the statute. Was there objection to this? We think not"), rehearing denied, 21 F. 2d 607 (1927), cert. denied, 276 U. S. 618 (1928); *Mavromatis* v. *United Greek Shipowners Corp.*, 179 F. 2d 310, 316 (CA1 1950) ("The language of § 596 has been given a somewhat free reading so as to accord to

sions were entirely consistent with the meaning a grammarian might have placed on the statute is less significant than the fact that they were entirely consistent with this Court's

---

the courts a considerable margin of discretion in adjusting the duration of the penalty to the equities of the particular case"); *Prindes* v. *S.S. African Pilgrim*, 266 F. 2d 125, 128 (CA4 1959) ("The period during which the penalty accumulates is to be determined by the equities of the particular case"); *Southern Cross S.S. Co.* v. *Firipis*, 285 F. 2d 651, 658 (CA4 1960) ("With regard to liability for double pay, a doctrine had developed before the McCrea case, and has continued to the present time, that the District Court has a measure of discretion through the application of equitable principles in determining the number of days for which double wages should be assessed"), cert. denied, 365 U. S. 869 (1961); *Caribbean Federation Lines* v. *Dahl*, 315 F. 2d 370, 374 (CA5) ("The time for which the penalty provision runs rests within the sound discretion of the court and depends upon the equities of the case"), cert. denied, 375 U. S. 831 (1963); *McConville* v. *Florida Towing Corp.*, 321 F. 2d 162, 168, n. 11 (CA5 1963) ("The Court has wide equitable discretion in fixing the time for which the penalty provision runs"); *The Chester*, 25 F. 2d 908, 911 (Md. 1928) ("[I]n spite of the seeming rigidity of the statute, there is still left to the courts certain discretionary power to limit the penalties"); *The Victoria*, 76 F. Supp. 54, 56 (SDNY 1947) ("In spite of the seeming rigidity of the statute, the court still has discretionary power to limit the penalties"), rev'd on other grounds, 172 F. 2d 434 (CA2 1949); *Forster* v. *Oro Navigation Co.*, 128 F. Supp. 113, 116 (SDNY 1954) ("The number of days for which the defendant must pay double wages rests in the discretion of the court and depends on the equities of the particular case"), aff'd, 228 F. 2d 319 (CA2 1955); *Samad* v. *The Etivebank*, 134 F. Supp. 530, 542 (ED Va. 1955) ("The number of days for which respondents must pay double wages rests in the discretion of the Court and depends upon the equities of the particular case"); *Spero* v. *Steamship The Argodon*, 150 F. Supp. 1, 6 (ED Va. 1957) ("It is well settled that the number of days for which respondents must pay double wages rests in the discretion of the Court and depends upon the equities of the particular case"); *Kontos* v. *SS Sophie C.*, 236 F. Supp. 664, 674 (ED Pa. 1964) ("Although the penalty is applicable, its duration seems to be committed to the discretion of the trial judge to tailor to the equities of the particular case"); *Ventiadis* v. *C. J. Thibodeaux & Co.*, 295 F. Supp. 135, 138 (SD Tex. 1968) (" 'The time for which the penalty provision runs rests within the sound discretion of the court and depends upon the equities of the case' "); see also *Swanson* v. *Torry*, 25 F. 2d 835 (CA4 1928); *The Lake Galewood*, 21 F. 2d 987 (Md. 1927), aff'd, 25 F. 2d 1020 (CA4), cert. denied, 278 U. S. 637 (1928).

decisions and with one another,[11] and the fact that their holdings must have come to the attention of Congress.

It was not until 1966 that a contrary reading of the statute was adopted by the Third Circuit in *Swain* v. *Isthmian Lines, Inc.*, 360 F. 2d 81,[12] and another eight years before that case was followed in another Circuit.[13] I cannot deny that there is wisdom in the rule of construction that mandates close adherence to literal statutory text,[14] but it is also true that a consistent course of judicial construction can become as much a part of a statute as words inserted by the legislature itself. The construction consistently followed by the federal judiciary between 1898 and 1966 was presumably acceptable to Congress, and I find this more persuasive than the literal reading on which the Court places its entire reliance.[15] Moreover, since the result that construction produces in this case is both absurd and palpably unjust, this is one of the cases in which the exercise of judgment dictates a departure from the literal text in order to be faithful to the legislative will.[16]

---

[11] See *Southern Cross S.S. Co.* v. *Firipis, supra,* at 655–658.

[12] See 360 F. 2d, at 85 ("Despite this rather precise statutory directive, of those cases which we have uncovered, where the question—whether Section 596 of the statute may still be read with a measure of judicial discretion when supposed equitable considerations present themselves—was considered, all have found proper the balancing of the statutory language with a judicial sense of the equities of each case").

[13] See *Escobar* v. *SS Washington Trader,* 503 F. 2d 271, 274 (CA9 1974), vacated and remanded on other grounds *sub nom. American Trading Transportation Co.* v. *Escobar,* 423 U. S. 1070 (1976).

[14] See, most recently, *Weinberger* v. *Romero-Barcelo,* 456 U. S. 305, 322–335 (1982) (STEVENS, J., dissenting).

[15] This Court based its interpretation of "sufficient cause" in *Collie* v. *Fergusson,* 281 U. S. 52 (1930), in part upon "the conclusion reached with practical unanimity by the lower federal courts." *Id.,* at 56.

[16] "The Court has had several occasions within the last few years to construe statutes in which conflicts between reasonable intention and literal meaning occurred. We have refused to nullify statutes, however hard or

## III

The construction permitting the district court to exercise some discretion in tailoring the double-wage award to the particular equities of the case is just as consistent with the legislative history of § 596 as the Court's new literal approach to this statute. In 1872, when Congress authorized the recovery of additional wages by seamen who were not paid within five days of their discharge, it used the word "shall" to make it clear that such a recovery must be awarded, but it allowed the district courts a limited discretion in setting the amount of such recovery.[17] The judge's discretion as to amount was limited in two ways: (1) the statutory wage rate could not be more than double the amount of the seaman's daily wage; and (2) the period for which the statutory wage could be awarded could not exceed 10 days.

Subsequent amendments to the statute did not remove the requirement that some recovery "shall" be awarded, but did modify both of the limits on the judge's discretion. With respect to the wage rate, Congress first specified that it should

---

unexpected the particular effect, where unambiguous language called for a logical and sensible result. Any other course would be properly condemned as judicial legislation. However, to construe statutes so as to avoid results glaringly absurd, has long been a judicial function. Where, as here, the language is susceptible of a construction which preserves the usefulness of the section, the judicial duty rests upon this Court to give expression to the intendment of the law." *Armstrong Paint & Varnish Works* v. *Nu-Enamel Corp.*, 305 U. S. 315, 332–333 (1938) (footnotes omitted).

[17] The 1872 version of § 596 provided in pertinent part:

"[E]very master or owner who neglects or refuses to make payment [of a seaman's earned wages within five days after the seaman's discharge] without sufficient cause shall pay to the seaman a sum not exceeding the amount of two days' pay for each of the days, not exceeding ten days, during which payment is delayed beyond the [five-day period]; and such sum shall be recoverable as wages in any claim made before the court . . . ." Act of June 7, 1872, ch. 322, § 35, 17 Stat. 269.

equal the daily rate—rather than double the daily rate—and later specified that the rate should be the double rate.[18] With respect to the period for which the statutory wage was payable, the 1898 amendment simply removed the 10-day limit. This amendment is subject to two different interpretations, one that would represent a rather unremarkable change and the other that would be both drastic and dramatic.

The unremarkable change would amount to nothing more than a removal of the narrow 10-day limit on the scope of the judge's discretion. The word "shall" would continue to do nothing more than require some recovery in an amount to be fixed by the judge, but in recognition of the reality that seamen might be stranded for more than 10 days, the recovery period could extend beyond 10 days. This sort of unremarkable change is consistent with the purpose of the statute,[19] as

---

[18] The 1898 version of § 596 provided in pertinent part:

"Every master or owner who refuses or neglects to make payment [of a seaman's earned wages within four days of the seaman's discharge] without sufficient cause shall pay to the seaman a sum equal to one day's pay for each and every day during which payment is delayed beyond the [four-day period], which sum shall be recoverable as wages in any claim made before the court . . . ." Act of Dec. 21, 1898, § 4, 30 Stat. 756.

The 1915 amendment substituted "two days' pay" for "one day's pay." See Act of Mar. 4, 1915, § 3, 38 Stat. 1164–1165.

[19] Justice Cardozo, while a member of the New York Court of Appeals, explained the purpose of the statute:

"The purpose, or at least the predominant one, was, not punishment of the master or owner, but compensation to the seaman. Delay means loss of opportunity to ship upon another vessel. It means hardship during the term of waiting, the sufferer often improvident, and stranded far from home. 'In all fairness he should recover more than the amount due him for wages earned' (*Calvin* v. *Huntley*, 178 Mass. 29, 32)." *Cox* v. *Lykes Brothers*, 237 N. Y. 376, 379, 143 N. E. 226, 227 (1924).

The District Court's award in this case, tolling the period for computing the double wages on the date petitioner obtained employment with another seagoing vessel, was also perfectly consistent with the statutory purpose.

well as with a legislative history that fails to make any comment on its significance. As JUSTICE REHNQUIST has perceptively observed in another context, the fact that the dog did not bark can itself be significant.[20]

The Court's construction of the amendment is, however, both drastic and dramatic. Instead of effecting a modest enlargement of the judge's discretion to do justice in these cases, the Court's construction effects a complete prohibition of judicial discretion. Instead of permitting recoveries for a period somewhat longer than 10 days, the amendment is construed as a command that even when the unresolved dispute persists for two or three years without any special hardship to the seaman, an automatic recovery must be ordered for the entire period regardless of the equitable considerations that may arise after the shipmaster's initial mistake has been made. Such a major change in both the potential amount of the statutory recovery and the character of the judge's authority would normally be explained in the committee reports or the debates if it had been intended.[21]

---

[20] *Harrison* v. *PPG Industries, Inc.*, 446 U. S. 578, 602 (1980) (dissenting opinion); cf. A. Conan Doyle, Silver Blaze, in The Complete Sherlock Holmes 383 (1938).

[21] The House Report's description of the 1898 amendment was that it "increases from one-fourth to one-third the amount of balance of wages due the seaman, to which he is entitled immediately upon discharge, and, in general, provides for prompter payment of wages of seamen." H. R. Rep. No. 1657, 55th Cong., 2d Sess., 3 (1898). It is noteworthy that the first change described, respecting the part of the seaman's wages to which he is entitled at the time of his discharge in every case, is rather trivial. See the full text of the statute, *ante*, at 569–570, n. 6. And the description of the provision for prompter payment of wages most likely refers to the amendment of the time period during which the shipmaster had to pay the seaman his full wages in order to avoid the double-wage provision of § 596. In the cases of seamen of vessels making foreign voyages, the time period was changed from five days in 1872, see n. 17, *supra*, to four days in 1898, see n. 18, *supra*.

## IV

It is ironic that the same seven Justices—who today are transfixed by a literal reading of § 596—only a few days ago blithely ignored the text of the Tax Injunction Act in order to reach the conclusion that a federal court has no jurisdiction to entertain a suit for a declaratory judgment against the United States Secretary of Labor to determine whether a federal statute violates the Federal Constitution. *California* v. *Grace Brethren Church*, 457 U. S. 393 (1982). The inconsistency in the Court's approach to the task of statutory construction in these two cases is less troublesome, however, than its failure in each case to consider whether its conclusion could reasonably be thought to represent the will of Congress. I am not persuaded that the 1898 amendment, removing the 10-day limit on the scope of the trial judge's discretion, was intended to be read as a command to award $302,790.40 to a seaman who was not paid $412.50 in wages when due.

I respectfully dissent.