113 T.C. No. 6


UNITED STATES TAX COURT


HARRY E. PEADEN, JR. AND CINDY D. PEADEN, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 14837-97.                    Filed August 9, 1999.

C, P's wholly owned S corporation, leased trucks under master lease agreements (master leases). For each truck, C and the lessor agreed to a base rent dependent on the lessor's cost of the truck. The master leases contain a terminal rental adjustment clause (TRAC), as defined in sec. 7701(h)(3), I.R.C., providing that the lessor, at the conclusion of the lease term, must sell the truck and remit to C any sale proceeds that exceed the remaining base rent plus the lessor's cost of arranging the sale. R does not argue that the lease agreements are not "qualified motor vehicle operating agreements" within the meaning of sec. 7701(h)(2), I.R.C., but instead argues that the TRAC may be taken into account in determining whether the transactions entered into pursuant to the master leases (lease transactions) should be treated as leases.

Held: Pursuant to sec. 7701(h)(1), I.R.C., the TRAC contained in the master

leases will not be taken into consideration in deciding whether the lease transactions are entitled to lease treatment. Held, further, the lease transactions are entitled to be treated as leases.

David D. Aughtry and Vivian D. Hoard, for petitioners.

Mark S. Mesler, for respondent.

WELLS, Judge:  Respondent determined a deficiency in petitioners' 1993 Federal income taxes of $977,267 and a section 6662 accuracy-related penalty of $195,453.

Unless otherwise indicated all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issues we must decide in the instant case are:  (1) Whether section 7701(h)(1) precludes consideration of a "terminal rental adjustment clause" (TRAC)[1] contained in certain agreements

---

[1]    Sec. 7701(h)(3) provides:

(3) Terminal rental adjustment clause defined.--

(A) In general.--For purposes of this subsection, the term "terminal rental adjustment clause" means a provision of an agreement which permits or requires the rental price to be adjusted upward or downward by reference to the amount realized by the lessor under the agreement

(continued...)

covering transactions entered into by Country-Fed Meat Co., Inc. (Country-Fed), a subchapter S corporation wholly owned by petitioner Harry E. Peaden, Jr. (petitioner) and (2) whether such agreements should be treated as leases or purchases of trucks.

FINDINGS OF FACT

Some of the facts and certain exhibits have been stipulated for trial pursuant to Rule 91. The parties' stipulations of fact are incorporated into this Opinion by reference and, accordingly, are found as facts in the instant case.

At the time they filed the petition, petitioners resided in Fayetteville, Georgia. Petitioner is the sole shareholder of Country-Fed, a corporation that was incorporated under the laws of the State of Georgia. Petitioner elected, before 1993, to have Country-Fed taxed as a small business corporation pursuant to section 1362(a).

Country-Fed is in the business of selling meat, chicken, and seafood products through direct sellers. Country-Fed's direct sellers distribute Country-Fed's products in approximately 20 States.

---

[1](...continued)
           upon sale or other disposition of such property.

During 1993, Country-Fed entered into separate agreements (collectively, master leases)[2] with World Omni Leasing, Inc. (World Omni), McCullagh Leasing, Inc. (McCullagh), and Automotive Rentals, Inc. (ARI) (collectively, the lessors) covering approximately 565 trucks, with attached refrigeration units, (trucks) for the following duration:  9 trucks for 50 months, 1 truck for 40 months, 10 trucks for 36 months, 321 trucks for 30 months, 72 trucks for 24 months, 114 trucks for 18 months, and 38 trucks for 12 months (collectively, lease transactions).  Each of the trucks has a useful life that extends beyond its respective lease term.  Country-Fed provides the trucks to direct sellers who use the trucks daily to distribute Country-Fed's products.

The master leases were negotiated at arm's length and contain the general provisions for individual lease transactions covering each of the trucks.  Country-Fed and the lessors adhered to the contractual terms of their respective master lease agreements.  Country-Fed is not required to make a downpayment in conjunction with any of the lease transactions.

The lessors realized a more than de minimis pretax economic benefit from each of the lease transactions.  As a part of each

---

[2]    The master leases are similar to one another in both form and substance.  To the extent that there are any important differences in the master leases, we will refer to the master leases separately.

lease transaction, Country-Fed executed the certification

required by section 7701(h)(2)(C).[3]  In each lease transaction,

---

[3]     Sec. 7701(h)(2) provides:

        (2) Qualified motor vehicle operating agreement
    defined.--For purposes of this subsection--
            (A) In general.--The term "qualified
        motor vehicle operating agreement" means any
        agreement with respect to a motor vehicle
        (including a trailer) which meets the
        requirements of subparagraphs (B), (C), and
        (D) of this paragraph.

            (B) Minimum liability of the lessor.--An
        agreement meets the requirements of this subparagraph
        if under such agreement the sum of--

                (i) the amount the lessor is
        personally    liable to repay, and

                (ii) the net fair market value of the
            lessor's interest in any property pledged as
            security for property subject to the agreement,

        equals or exceeds all amounts borrowed to finance
        the acquisition of property subject to the
        agreement.  There shall not be taken into account
        under clause (ii) any property pledged which is
        property subject to the agreement or property
        directly or indirectly financed by indebtedness
        secured by property subject to the agreement.

            (C) Certification by lessee; notice of tax
        ownership.--An agreement meets the requirements of
        this subparagraph if such agreement contains a
        separate written statement separately signed by
        the lessee--

                (i) under which the lessee certifies,
            under penalty of perjury, that it intends that
            more than 50 percent of the use of the property
            subject to such agreement is to be in a
            trade or business of the lessee, and
                                        (continued...)

the lessor's rental income over the period of the lease exceeded the sum of the lessor's depreciation and cost of financing its purchase of the trucks.

A typical lease transaction takes place as follows: Country-Fed first identifies the type of truck it wishes to lease. The lessor then obtains the truck that Country-Fed has identified. Often, Country-Fed negotiates with dealers regarding the price for which the lessor could acquire the truck. After identifying a truck which Country-Fed wishes to lease, Country-Fed and the lessor execute a "New Vehicle Order"[4] which is subject to the terms of the master lease and contains the

---

[3](...continued)

        (ii) which clearly and legibly states that the lessee has been advised that it will not be treated as the owner of the property subject to the agreement for Federal income tax purposes.

        (D) Lessor must have no knowledge that certification is false.--An agreement meets the requirements of this subparagraph if the lessor does not know that the certification described in subparagraph (C)(i) is false.

As to each truck, Country-Fed executed the certification required by sec. 7701(h)(2)(C) and used the truck in its business. There is no evidence in the record regarding how the lessors financed their acquisition of the trucks.

[4]    This is the term used by the McCullagh master lease. The ARI master lease refers to this agreement as a "Motor Vehicle Lease Agreement". The World Omni master lease refers to this agreement as the "Leased Unit Quotation". Despite the difference in terminology, the information contained in each document is essentially the same.

following additional information as to the particular truck:
(1) The term of the lease; (2) the base rent;[5] and (3) the
monthly rental charge.

The base rent represents the sum of all of the monthly rent
due throughout the lease transaction for the particular truck.
The base rent is dependent on the lessor's cost of obtaining the
truck and refitting it to petitioner's specifications, which
could include the purchase and attachment of the refrigeration
units.  Over the lease term, a fixed portion of the monthly rent
is applied to reduce the base rent.  The amount of the reduction
is calculated to be equal to an amount that, at the end of the
lease term, effectively reduces the base rent to zero.[6]  The
remaining portion of the monthly rent is a service and
administrative charge that is not applied to reduce the base
rent.[7]

---

[5]     The ARI master lease refers to this figure as the
Capitalized Value.

[6]     The ARI master lease reaches the same result by providing
that, upon the termination of the lease period, the Capitalized
Value is reduced by the "total depreciation reserve".  The "total
depreciation reserve" is determined by multiplying:  (1) The
number of months a vehicle is billed in service and paid by the
Lessee, times (2) the Capitalized Value, times (3) the monthly
depreciation percentage, which is determined at the outset of the
lease.  The monthly depreciation percentage is calculated to be
equal to an amount that, at the end of the lease term,
effectively reduces the Capitalized Value of the truck to zero.

[7]     Under the ARI master lease this is the portion of the
(continued...)

In addition to the monthly rent, Country-Fed must pay all registration and compliance fees not included in the base rent. Country-Fed also must pay any taxes that accrue with respect to the use or possession of the particular trucks during the term of its lease transaction.

Country-Fed must repair any damage to the trucks. If a truck is damaged beyond repair, Country-Fed must pay the lessor the remaining base rent.[8]

The master lease provides that title to the leased truck remains with the lessor throughout the term of the lease. At the end of the lease term for a particular truck, Country-Fed is responsible to return that truck to the lessor. If the truck remains in Country-Fed's possession beyond the term of the respective lease, Country-Fed is required to continue paying the lessor the monthly service and administrative fees.

Upon return of the truck, the lessor is obligated to sell the truck. If the proceeds of the sale obtained by the lessor exceed any remaining base rent, plus the cost to the lessor of

---

[7](...continued)
monthly rent not included in the depreciation reserve. The ARI master lease also provides that Country-Fed may continue to use the truck at the end of the lease term as long as it continues to pay the "administrative" portion of the monthly rent.

[8] Under the ARI master lease, if a truck was damaged beyond repair, Country-Fed can elect to terminate the lease. Termination of the lease effectively results in Country-Fed's paying the lessor the remaining base rent. See infra.

arranging the sale, the lessor is required to remit the excess to Country-Fed.  If the proceeds of the sale obtained by the lessor are less than any remaining base rent, plus the cost to the lessor of arranging the sale, Country-Fed is required to pay the lessor the difference.

The McCullagh master lease contains an option for Country-Fed to buy the respective truck at the end of its lease term for the truck's fair market value.  The ARI master lease specifically provides that Country-Fed has no option to purchase the respective truck at any time.  The World Omni master lease does not provide an option for Country-Fed to buy the respective truck but provides that Country-Fed may purchase the truck if it is being sold at a public sale.  Country-Fed did, however, acquire title to most of the trucks at the end of the respective lease transactions.

On or about April 9, 1997, respondent issued a notice of deficiency that determined a deficiency in petitioners' Federal income tax in the amount of $977,267 for their 1993 taxable year. Respondent increased petitioners' Schedule E income by $2,304,296.  In calculating the increase, respondent determined that petitioners were not entitled to:  (1) A rental deduction of $2,946,224 for the lease of trucks and related equipment by Country-Fed; (2) an employee business relations/entertainment deduction of $222,425; and (3) other deductions of $350,365.

Respondent allowed petitioners additional Schedule E deductions of $1,092,804 for depreciation and $121,914 for fringe benefits paid to employees. Additionally, respondent increased petitioners' adjusted gross income by $91,672 for fringe benefits received and disallowed $71,879 in itemized deductions. Respondent further determined that petitioners were liable for an accuracy-related penalty pursuant to section 6662 of $195,453.

The parties have settled all of the issues determined in the notice of deficiency except the disallowed Schedule E rental deduction for the trucks and related equipment leased by Country-Fed and the allowable depreciation deduction if the rental deduction is disallowed.

                              OPINION

We must decide whether section 7701(h)(1) precludes consideration of the TRAC contained in the master leases covering the lease transactions and whether the lease transactions should be treated as leases or as purchases of trucks. Neither party disputes that the provisions of the master leases that require either the lessor to remit to Country-Fed the amount by which the sale proceeds of the truck exceed the remaining base price plus the cost of the sale, or, conversely, require Country-Fed to remit to the lessor the amount by which the remaining base rent plus the cost of the sale exceeds the proceeds, are a "terminal rental adjustment clause" within the meaning of section

7701(h)(3).  Respondent contends that the lease transactions are conditional purchases of trucks because, as to any particular lease transaction, the remaining base rent is always lower than the fair market value of the respective truck at the end of its lease term.  Respondent points to the TRAC contained in each of the master leases and argues that, because the amounts that the lessors receive on the sale of the trucks always exceed the remaining base rent, Country-Fed could, and for the most part did, acquire the trucks at the end of the lease term for a nominal price.  Accordingly, respondent argues, the substance of the lease transactions is the purchase of a truck.

Petitioners argue that, in deciding whether the lease transactions should be treated as leases, section 7701(h)(1) precludes consideration of the TRAC upon which respondent relies. Petitioners argue that, but for the TRAC, the substance of the lease transaction is a lease and therefore the lease transactions should be treated as leases.

Section 7701(h)(1) provides:

SEC. 7701 (h).  Motor Vehicle Operating Leases.--

(1) In general.--For purposes of this title, in the case of a qualified motor vehicle operating agreement which contains a terminal rental adjustment clause--

(A) such agreement shall be treated as a lease if (but for such terminal rental adjustment clause) such agreement would be treated as a lease under this title, and

(B) the lessee shall not be treated as the
owner of the property subject to an agreement
during any period such agreement is in effect.

Respondent does not contend that the master leases are not "qualified motor vehicle operating agreements".[9] Rather, respondent argues that the TRAC may be considered in deciding whether the substance of the lease transactions is the purchase of a truck. We disagree. "The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" United States v. Ron Pair Enters., Inc., 489 U.S. 235, 242 (1989) (quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571 (1982)).

Section 7701(h) was enacted after our decision in Swift Dodge v. Commissioner, 76 T.C. 547 (1981), revd. 692 F.2d 651 (9th Cir. 1982). In Swift Dodge, the taxpayer, a leasing company, entered into various lease transactions. Under the terms of each lease, part of the lessee's monthly payments was to be applied to the cost of the vehicle ("capitalized cost") resulting in the "depreciated value". The lease further provided that, if at the end of the lease term the actual wholesale value of the car exceeded its "depreciated value", the lessor would

_____

[9]   See the statutory definition of "qualified motor vehicle operating agreement" set forth supra note 3.

remit the excess to the lessee.  Conversely, if the "depreciated value" of the car exceeded its actual wholesale value, the lessee would pay the difference to the lessor.  We held that the agreement in question was a lease, noting that the depreciated value was calculated on the basis of expected depreciation of the vehicle over the course of the lease.  See id. at 569, 570.  We explained that "the inclusion of a contract provision that shifts the depreciable loss to the extent of wholesale value away from the taxpayer in an attempt to minimize business risks does not control for purposes of determining whether the agreement is a lease or conditional sales contract."  Id. at 569.  We further stated that "this is not a case in which the total rental payments paid all but a nominal amount of the cost of the leased property."  Id. at 572.

After our decision in Swift Dodge v. Commissioner, supra, Congress enacted the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, 96 Stat. 324.  TEFRA section 210, 96 Stat. 447, precluded the Commissioner from considering TRAC provisions in determining whether an agreement was a lease until a statute is enacted or regulations are issued.  See Leslie Leasing Co. v. Commissioner, 80 T.C. 411 (1983).  After the enactment of TEFRA, the Court of Appeals for the Ninth Circuit reversed our decision in Swift Dodge v. Commissioner, 692 F.2d at 651.  The Court of Appeals held that the agreement in question

was closer to a conditional sales agreement than to a lease.  See
id. at 654.  The Court did not consider the effect of TEFRA
section 210.  After the decision of the Court of Appeals in Swift
Dodge, the Commissioner proposed regulations which would have
prevented leases containing TRAC provisions from being treated as
leases.  See sec. 1.168(f)(8)-12, Proposed Income Tax Regs., 47
Fed. Reg. 52730 (Nov. 23, 1982).

During 1984 Congress enacted section 168(f)(13) as part of
the Deficit Reduction Act of 1984 (DEFRA), Pub. L. 98-369, sec.
32, 98 Stat. 494, 530.  DEFRA section 32 is virtually identical
to current section 7701(h), which was enacted during 1986 as part
of the Tax Reform Act of 1986 (TRA 1986), Pub. L. 99-514, sec.
201(c), 100 Stat. 2085, 2138.  The legislative history of DEFRA
section 32 specifically refers to:  (1) Our decision in Swift
Dodge, (2) the decision of the Court of Appeals for the Ninth
Circuit in Swift Dodge, and (3) the proposed regulations.  See H.
Rept. 98-432, at 1615 (1984); S. Rept. 98-169, at 865 (1984); H.
Conf. Rept. 98-861, at 801 (1984), 1984-3 C.B. (Vol. 2) 1, 55.
By those references, we know that, when DEFRA section 32 was
enacted, Congress was aware of our holding and the Court of
Appeals' holding in Swift Dodge, as well as the proposed
regulations.  Consequently, when the DEFRA section 32 was enacted
and when the current, identical section 7701(h) was enacted as
part of TRA 1986, Congress, being well aware of those holdings

and regulations, could have specifically denied the protection provided by section 7701(h) to lease transactions such as those in issue in the instant case where "the total rental payments paid all but a nominal amount of the cost of the leased property." Swift Dodge v. Commissioner, 76 T.C. at 572. Congress, however, did not elect to place such limitations in section 7701, and it is not within our province to do what Congress failed to do or elected not to do. See Hanover Bank v. Commissioner, 369 U.S. 672, 688 (1962).

Consequently, we will adhere to the plain language of section 7701(h). As required by that section, we will analyze the lease transactions without the TRAC; that is, we will look at the lease transactions as if the lessors received possession of the trucks at the end of the lease term without any obligation to sell them and remit to Country-Fed any proceeds which exceed the base price plus the cost of arranging the sale. Moreover, as a result of our disregarding the TRAC, we regard any sale of the trucks to Country-Fed under the provisions of the McCullagh or World Omni master leases[10] as sales at fair market value as required by the master leases.[11]

---

[10]    The ARI master lease specifically provides that Country-Fed has no option to purchase the truck at the end of the lease term.

[11]    That Country-Fed in fact paid only a nominal price for the purchase of the trucks at the end of the lease term is a direct

(continued...)

Once the TRAC is disregarded, the master leases contain standard equipment lease provisions that do not preclude treatment of the lease transactions as leases. See, e.g., Torres v. Commissioner, 88 T.C. 702, 721 (1987) ("because net leases are common in commercial settings, it is less relevant that * * * [the lessor] was not responsible for the payment of property taxes or that * * * [the lessor] bears less of a risk of loss or damage to the property because the lessee is required to maintain insurance on the property."); Gefen v. Commissioner, 87 T.C. 1471, 1493 (1986) ("we have long rejected any notion that a net lease * * * shifts the burden of ownership from the lessor to the lessee."); Northwest Acceptance Corp. v. Commissioner, 58 T.C. 836, 847-848 (1972) (finding that even a generous purchase option is not fatal to lease determination), affd. per curiam 500 F.2d 1222 (9th Cir. 1974). Accordingly, in the instant case, we conclude that the lease transactions should be treated as leases.

Finally, the form of a transaction, if imbued with tax-independent considerations, has economic substance and will be

---

[11](...continued)
result of the TRAC. Because Country-Fed was entitled to the proceeds of the sale above any remaining base price plus the costs to the lessor of arranging the sale, when Country-Fed purchased the trucks, it was not required to pay the lessor anything above the base price plus the costs to the lessor of arranging the sale. Moreover, because the base price was effectively reduced to zero at the end of the lease term, Country-Fed would be required to pay only a nominal amount to purchase the vehicle at the end of the lease term.

respected for Federal income tax purposes.  See <u>Frank Lyon Co. v. United States</u>, 435 U.S. 561, 584-585 (1978); <u>Hulter v. Commissioner</u>, 91 T.C. 371, 388 (1988).  Country-Fed chose to lease the trucks instead of purchasing them outright because the lessors did not require a downpayment on leased trucks.  Not having to make a downpayment on the trucks allowed Country-Fed to use its capital elsewhere in its expanding business.  Of course, leasing the trucks apparently[12] resulted in additional tax benefits to Country-Fed in the form of accelerated deductions.  That a transaction is shaped in part, however, by tax considerations is not a sufficient reason for disregarding its form.  See <u>Frank Lyon Co. v. United States</u>, <u>supra</u> at 581.

We have considered the parties' remaining arguments and find them irrelevant or unnecessary to reach.  To reflect the foregoing and the concessions of the parties,

<u>Decision will be entered</u>

<u>under Rule 155</u>.

---

[12]    Petitioner has moved to shift the burden of proof arguing that the amounts in the notice of deficiency relating to allowed depreciation deductions were arbitrary.  Because we hold that petitioner is entitled to rental deductions and not depreciation deductions, with respect to the trucks, petitioner's motion to shift the burden of proof is moot.